HENRY L. DOHERTY & CO. v. RICE et al.

(Circuit Court, M. D. Alabama, N. D. September 6, 1910.)

In Equity, No. 291.

1. MONOPOLIES (§ 20*)—CONSOLIDATION OF CORPORATIONS—CONTRACTS—VALIDITY.

Under Code Ala. 1907, §§ 3481, 3640, authorizing domestic and foreign corporations to acquire and own the stock of any domestic corporation, a domestic corporation supplying electricity for light and power in a city subject to municipal regulations, as authorized by section 1260, may acquire the stock of a competing corporation without thereby creating a monopoly at common law, or within sections 7579 and 7580, prohibiting monopolies, and a contract for the purchase by such corporation of the stock of a competing corporation is not contrary to public policy.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

2. MONOPOLIES (§ 20*)—REGULATION—STATUTORY POWER.

As the Legislature may modify the common law governing combinations restricting production, controlling prices, and stifling competition, where it authorizes the consolidation of corporations, or the holding by one corporation of the stock in a competing corporation, the court may not impute to the Legislature an intent to condemn such consolidation or such holding of stock, because it may lead to the destruction of competition.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

3. CONTRACTS (§ 121*)—VALIDITY—PUBLIC POLICY.

A contract by persons owning a majority of the stock of a corporation supplying electricity for light and power in a city for the purchase of a majority of the stock of a competing corporation is not violative of the public policy of Alabama, as evidenced by Code Ala. 1907, §§ 3481, 3640, authorizing corporations to acquire and own stock in other corporations.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 504; Dec. Dig. § 121.*]

4. CORPORATIONS (§ 180*)—RIGHTS OF SHAREHOLDERS.

In equity, the shareholders of a corporation are the owners of the corporate property, and on the dissolution of the corporation and payment of its debts the corporate property belongs to them as individuals, and while the corporation exists and does business, they are entitled to control its affairs, in the proportion to the number of their shares, through the instrumentalities provided by law.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 665–673; Dec. Dig. § 180.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. SPECIFIC PERFORMANCE (§ 70*)—CONTRACTS ENFORCEABLE—CONTRACTS FOR THE SALE AND PURCHASE OF CORPORATE STOCK.

A bona fide contract for the sale of actual corporate stock is enforceable in equity where it would decree specific performance of a similar contract relating to any other kind of personal property.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 203; Dec. Dig. § 70.*]

6. SPECIFIC PERFORMANCE (§ 70*)—CONTRACTS ENFORCEABLE—CONTRACTS FOR THE SALE AND PURCHASE OF CORPORATE STOCK.

Where a contract for the sale and purchase of corporate stock was made on a valuable consideration and without mistake or fraud, and it was fair on its face, and specific performance which could be compelled by a single decree would not be oppressive to the seller, the buyer, who performed or tendered performance of the conditions required of him, could sue for the specific performance of the contract.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 203; Dec. Dig. § 70.*]

7. SPECIFIC PERFORMANCE (§ 126*)—DECREE—SCOPE OF RELIEF.

Where one contracting to buy corporate stock offers, on seeking specific performance, to perform on his part, and submits himself to the court to decree what may be proper in enforcing the rights of the seller, enforcement of the legal and equitable rights of the parties may be effected by one decree, if the seller either accepts the offer, so that the buyer may not afterwards retract it, or refuses the offer, and unsuccessfully resists specific performance.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 401–405; Dec. Dig. § 126.*]

8. SPECIFIC PERFORMANCE (§ 97*)—CONTRACTS—TENDER OF PERFORMANCE—SUFFICIENCY.

Where a seller in a contract for the sale and purchase of corporate stock on specified conditions left the jurisdiction and withdrew the power of his attorney to act for him, so that immediate tender to him became impossible, the buyer suing for specific performance of the contract, and asking and tendering performance on his part, and submitting himself to the jurisdiction of the court, thereby did all in his power to perform and to protect his rights, entitling him to maintain the suit and to be regarded, pending final decree, as the equitable owner of the stock entitled to protection as such.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 286–298; Dec. Dig. § 97.*]

9. SPECIFIC PERFORMANCE (§ 108*)—TEMPORARY INJUNCTION—STATUS QUO.

Complainant contracted to buy 800 out of a total outstanding 1,000 shares of stock of a corporation owned or controlled by defendant with power of sale. A third person, with notice of complainant's rights, acquired from defendant the legal title to the identical stock, and he proceeded to exercise his rights as such owner in the management of the corporation. *Held*, that the third person was the holder of the naked legal title of the stock, the equitable title to which was in complainant, and equity, pending a suit by complainant for the specific performance of the contract of sale, would restrain the third person from using the stock for his own advantage, or to the detriment of complainant.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 353; Dec. Dig. § 108.*]

10. SPECIFIC PERFORMANCE (§ 70*)—CONTRACTS ENFORCEABLE.

Where the holder, who had power of sale of corporate stock, contracted to sell the same to a buyer on specified conditions, and then subsequently transferred the legal title to a third person having notice of the sale, the fact that the voting of the stock was vested in trustees did not prevent equity from decreeing specific performance of the contract in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

favor of the buyer, after first annulling the transfer of the legal title to the third person.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 203; Dec. Dig. § 70.*]

11. Specific Performance (§ 108*)—Temporary Injunction.

Defendant, who owned or controlled with power of sale 800 of the 1,000 outstanding shares of a corporation supplying electricity to a city, contracted to sell to complainant 800 shares, and to endeavor to deliver to him the remainder. Trustees were entitled to vote the stock. Subsequently a third person, with knowledge of the contract, acquired from defendant the legal title to the 800 shares, and exercised his rights as owner by controlling the corporation, which entered into contracts for the extension of its plant and for the issuing of additional stock and bonds. The business of the corporation had not been successful, but it had constantly incurred debts. The public interests would not be prejudiced by maintaining the status quo, pending a suit by complainant for the specific performance of the contract of sale, and the corporation could continue its business as it had done in the past, without disturbing a single consumer. *Held*, that the court was authorized to issue a temporary injunction maintaining the status quo pending the disposition of the suit.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 353; Dec. Dig. § 108.*]

12. Corporations (§ 310*)—Powers of Directors.

The board of directors of a corporation must manage the corporate affairs solely in the interest of the corporation, regardless of the effect of the policies and management on the fortunes of individual stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1352–1362; Dec. Dig. § 310.*]

Suit by Henry L. Doherty & Co. against Alex. Rice and others. Preliminary injunction granted.

This is a suit in equity for the specific performance of a contract for the sale of corporate stock having no market rating.

In May, 1910, the defendant Rice, of the city of Montgomery, contracted with Henry L. Doherty & Co., of the city of New York, to sell and deliver to the latter 800 out of a total outstanding 1,000 shares of the capital stock of the Citizens' Light, Heat & Power Company, which he in the contract represented were owned or controlled by him, with power of sale. The price agreed upon was on the basis of $75,000 for the entire outstanding stock, the purchaser agreeing to assume the floating indebtedness of the company, not exceeding the sum of $75,000, and to accept the property subject to a bonded indebtedness of $50,000. Rice guaranteed that the floating indebtedness would not exceed $75,000, and agreed to assume any amount in excess of that sum. He further stipulated that he would use his best endeavors to secure and deliver to the purchasers the remaining 200 shares of the stock of the corporation, procure the resignation of its officers and directors, and to put the nominees of the purchaser in charge in so far as the amount of stock thus owned and controlled by them would permit. By a separate agreement made at the same time between the same parties, it was stipulated that in consideration of the personal indemnity assumed by the defendant Rice in the first-mentioned agreement, and because of certain other items of expense incurred by the corporation in the way of personal services and attorney's fees, and to compensate Rice and certain officers and employés of the corporation for their good will and efforts in behalf of the purchaser, the latter would pay to Rice in installments the sum of $35,000.

The Citizens' Light, Heat & Power Company is a quasi public corporation, engaging in generating and distributing electricity for heating and power purposes in the city of Montgomery. Rice having failed to deliver the stock,

Doherty & Co. filed their original bill against him for specific performance of the contract, and thereupon obtained a temporary restraining order forbidding the sale or assignment by him of the stock and preserving its status pending the litigation. Subsequently a supplemental bill was filed against one Richard Tillis and others, alleging that, as the result of secret negotiations between him and the defendant Rice, the said Tillis, subsequent to the filing of the original bill and with full notice of complainant's prior equity, had acquired the identical stock which Rice had contracted to sell to complainants. It was further alleged that, as the result of this transaction, the property of the corporation was being loaded down with unwarranted and ill advised contract obligations, and that the board of directors and officers in charge of the corporation had no pecuniary or real interest in the enterprise, and that they were dominated and controlled by the said Tillis. A temporary restraining order was sought, and obtained, preserving the status of the stock with respect to the claim of the defendant Tillis, and also forbidding certain proposed extensions or additions to the plant of the corporation.

The cause is submitted on motion of complainants for an injunction pendente lite, as prayed in the original and supplemental bills. The objections of the respondents thereto, which are addressed mainly to the equity of the bills, are stated in the opinion of the court.

On the submission of the cause for preliminary injunction on the original and supplemental bills, many affidavits were introduced by the parties; but the objections of the respondents were addressed mainly to the equity of the bills. The substance of the affidavits and objections are fully stated in the opinion of the court.

Steiner, Crum & Weil, Charles A. Frueauff, and Jno. R. Tyson, for complainants.

Ray Rushton, Horace Stringfellow, J. M. Chilton, and Ball & Samford, for respondents.

JONES, District Judge (after stating the facts as above). While the affidavits submitted on this hearing cover a wide range, and counsel have earnestly and ably urged many legal principles on the issues thus raised, the refusal or granting of a preliminary injunction depends upon two controlling questions: First, whether Rice's contract with complainants is such an one as a court of equity can and ought to enforce by decreeing specific performance; and, second, how far, if specific performance be allowed, can the court properly go for the relief of complainants, in view of the quasi public nature of the two defendant corporations, in restraining issuance of stock and bonds, and the contemplated improvements of their plant. The Citizens' Light, Heat & Power Company is a domestic corporation, chartered on July 2, 1903. Its original capital stock was $30,000, which, by amendment to its charter, was increased to $50,000, and afterwards, by proper proceedings in the probate court, on May 22, 1907, was authorized to be increased to $200,000. The total outstanding issue at the time of the filing of the bill was $50,000, divided into 500 shares of $100 each. The Citizens' Light & Power Company is also a domestic corporation, and what is known as a "holding company." It does no business itself, but votes and controls the stock in the first company, and has a capital stock of $100,000. The owners of the stock of the Citizens' Light, Heat & Power Company transferred their stock in that company to the Citizens' Light & Power Company in payment of subscriptions to the capital stock of the company, and received stock

two for one. The holders of the stock transferred it to certain individuals as trustees, and received, in return, trustees' certificates from them. The trustees were to exercise exclusively all the powers and privileges that could be exercised by the owners of the stock, with certain exceptions not here material; the instrument creating the trust further required the stock in the hands of the trustees to be voted as a unit by them on all questions, to be decided by a majority of the trustees. The trust can be dissolved at any time by a majority vote of the trustees, if concurred in by a vote of a majority of the owners of the trustees' certificates, which represent the stock placed in the trust. The trust is to continue for five years, with the privilege on the part of the trustees to extend it for an additional five years.

Alex. Rice, who owned and controlled 800 out of a total of 1,000 shares or the trustees' certificates representing them, contracted to sell these shares and stock certificates to Doherty & Co. on certain terms and conditions. Differences arose as to performance, and Rice declined to consummate the contract. Thereupon Doherty & Co. filed their bill against him to compel specific performance, and an injunction issued forbidding him to transfer the stock or trust certificates, and also against the two light companies forbidding them to permit any transfer of the stock to be made upon their books until the further order of the court.

After the injunction had been served upon the manager of the light companies, but not upon Rice, who evaded the service, Tillis, by aid of Rice's attorney and the officers and directors of the light company and the trustees who issued the certificates representing the stock, consummated the sale by transfer of the stock on the stock books, and had trustees' certificates issued to himself. Tillis not only took with notice of Rice's contract with complainants, but indemnified him against damage for its breach. The bill was amended, making Tillis a party, and a restraining order issued forbidding him, in substance, from doing anything to disturb the status which the court by its restraining order against Rice had decreed was proper to be maintained regarding the stock and trustees' certificates pending final decree. As the light companies, of which Tillis had obtained control by the transfer to him of the stock owned and controlled by Rice, are the instrumentalities by which he could effect his purpose as alleged in the bill, those corporations which were defendants to the original and amended bills were also restrained in substance from doing anything which could disturb the status. Before this restraining order was served, Tillis, by virtue of his control of the directorate of the Citizens' Light, Heat & Power Company, had that corporation issue 800 more shares of the capital stock, for which he subscribed, thus making him the owner, including the certificates gotten from Rice representing 917 shares in the Citizens' Light & Power Company, and half that number in the Citizens' Light, Heat & Power Company, and also of 800 additional shares out of a total issue of 1,300 shares by the latter company, and, as the bills allege, the light company now proposes a further issue of bonds, which had been authorized before this controversy arose, and very heavy expenditures to enlarge the plant and equipment.

Tillis is the owner and controller of the great majority of the capital stock of the Montgomery Traction Company, the largest consumer of electric current in this city, which is now furnished by the Montgomery Light & Water Power Company. That company has been doing business in Montgomery for 15 years past, and is and has long been a competitor of the light company in furnishing electric light and power in the city and suburbs. Doherty & Co. own the majority of its stock and control its operations. Tillis states in his affidavit that, not being able to attend personally to the negotiations, he authorized a friend, in the event there was an opportunity to do so, to purchase for him "the absolute control" of the Citizens' Light, Heat & Power Company, and that, so far as he knows or believes, no one besides Doherty & Co. or the Montgomery Light & Water Power Company want the stock of the Citizens' Light, Heat & Power Company; "that he knew, when he bought it, there was no general market value for the shares, and that, if he should ever want to sell them, probably the only one who would purchase them would be Doherty & Co. or the Montgomery Light & Water Power Company, and that they would only purchase it in order to get rid of said company as its competitor."

It is quite evident, therefore, that the struggle here is in reality between Tillis under the form of the light company and the Montgomery Light & Water Power Company under the form of Doherty & Co. whether or not the contract with Rice shall be effectually enforced. Doherty & Co. control the Montgomery Light & Water Power Company, and expect to make it the ultimate beneficiary of the contract with Rice, if they enforce it. We may lay aside all questions as to the motives or intentions of the disputants, and confine the controversy to the legal and equitable rights of the parties under the circumstances disclosed under the evidence in the case as now presented.

Strenuous insistence is made by counsel for the respondents that Rice's contract with Doherty & Co., in view of the fact that the latter are owners of most of the shares of stock and controllers of the Montgomery Light & Water Power Company, is contrary to public policy and void, as tending to create an unlawful monopoly and stifle competition, and is therefore forbidden by the laws of this state.

[1] We must look to the Constitution and laws of Alabama to solve this contention. Code of Alabama 1907, § 3481, subd. 10, authorizes domestic corporations to "subscribe for, acquire, hold and dispose of stocks, bonds or other evidence of indebtedness of any other corporation of this or any other state, or foreign countries, and while owners thereof to exercise the rights, privileges and powers of ownership, including the right to vote," etc., and under subdivision 11 of the same section they may also consolidate before or after the completion of their works and plants with any other corporation or corporations under certain conditions hereafter noted. Under section 3640, any foreign corporation "may acquire by subscription to the capital stock or by purchase or otherwise, and hold, own and vote shares of the capital stock of any corporation organized and existing under the laws of this state." Section 1260 of the Code authorizes cities and towns to regulate the manner and rates for furnishing gas, electricity, and water, and prescribe the quality of the gas and electricity furnished the in-

186 F.—14

habitants by any person or corporation. They may prescribe penalties for violation of their ordinances upon the subject. The only limitation placed upon the right of domestic corporations to consolidate with one another is that telegraph and telephone companies shall not do so, and that banking and railroad companies shall not consolidate with any other than like kinds of corporations. Large latitude is given mining and manufacturing companies, street railroads, and railroads to hold stock in other like enterprises and to consolidate with them. The legislation of the state authorizes consolidations between corporations like those here involved, and allows foreign corporations to purchase stock in them, although the Legislature well knew that light and power corporations are always competitors, if there be more than one in the locality where the business of the corporation is carried on.

It is thus manifest that the Legislature, in view of the industrial and business conditions of our people, believed the good from such combinations would outweigh the evil that might result, and relied upon the exercise of the power to regulate their rates, which is vested in the state and its subordinate municipal agencies, as ample safeguard for the public weal against all combinations which its laws allowed. It did not and does not view such combinations or holdings of stock as evils, but rather as promotive of the public weal. As said in the United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007:

"When the lawmaking power speaks upon a particular subject over which it has constitutional power to legislate, public policy in such a case is what the statute enacts."

This court in the face of these laws and the policy thus declared cannot refuse to enforce the contract here involved, on the ground that it would be contrary to public policy, without exercising the legislative power of the state and undertaking to police its domestic affairs.

It is earnestly insisted, however, that this is not the proper construction of our statutes in view of sections 7579, 7580, and 7581 of the Criminal Code, and qualifications of the power given by section 3640 to a foreign corporation to acquire and vote stock in a domestic corporation, to the effect that it should "not be construed as authorizing any monopoly or trust or unlawful combination in the nature of a trust or monopoly." In Citizens' Light, Heat & Power Company v. Montgomery Light & Water Power Company (C. C.) 171 Fed. 553, this court had occasion to consider section 103 of the Constitution, which was adopted subsequently to those sections, and held they must be read in the light of the Constitution, which necessarily limited their meaning and operation.

[2] It will not be questioned that the common law regarding combinations or restrictions of production and attempts to control prices or stifle competition can be changed at the pleasure of the Legislature. It may relax or tighten the stringency of the common-law rule, making lawful that which was unlawful at the common law, and condemning that which the common law authorized, as in its wisdom seems best. Neither on reason nor authority is it permissible to im-

pute to the Legislature the intent to condemn the holding of stock or the consolidation of interests in competing corporations, because it may lead to the diminishing or destruction of competition, when the Legislature has expressly authorized the making of such consolidations, or the holding of stock by one corporation in another corporation of which it is a competitor. The Legislature is judge of what is "reasonable" or "unreasonable" in these matters, and what shall be condemned as an unlawful combination or monopoly under its laws.

The Alabama statutes leveled at certain combinations of capital is quite different from the Sherman act, which strikes at all restraint of interstate commerce, whether "reasonable" or "unreasonable," where the restraint is direct and the result of combination. Indeed, in view of the grounds on which Mr. Justice Brewer, one of the five judges, concurred in the judgment in the Northern Securities, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the exact scope of that decision is yet to be marked out and defined by the Supreme Court of the United States. We are not concerned here with interstate commerce, and the Legislature has not power, as Congress had, regarding the subject upon which it acted, to strike down all restraint, whether reasonable or unreasonable, or whether the effect be direct or indirect. The corporation laws of New York provide:

"No domestic stock corporation, and no foreign corporation doing business in this state, shall combine with any other corporation or person for the creation of a monopoly or the unlawful restraint of trade, or the prevention of competition in any necessary of life."

The Attorney General sought to forfeit the charter of the Consolidated Gas Company because it had purchased the majority of the stock in other competing corporations, insisting, in substance, that the authority given under other laws to buy and hold such shares could not be exercised when it would contravene the section of the Code quoted. The Appellate Division of the Supreme Court of New York (Attorney General v. Consolidated Gas Co., 124 App. Div. 401, 108 N. Y. Supp. 823) refused to allow quo warranto to be filed, because the transactions assailed were not violative of the laws of New York. In its opinion fortified by numerous decisions of the Court of Appeals of the state the court said:

"The Consolidated Gas Company cannot as a result of its control of the business of furnishing gas either limit the production or increase the prices and maintain them because these matters are within the control of the Legislature. It is within the power of that body, and it has frequently used the power, to fix the maximum rates which may be charged to consumers, and it is well settled that any person within the territory served by gas or electric companies is entitled to be furnished such gas or electricity as he requires upon the payment of the statutory price therefor and to compel the company to so furnish it. That a single company, if thus regulated by law as to prices of production, does not offend against the anti-monopoly laws, even though its field of operation extend over the whole city, seems quite clear."

Light and power companies are incorporated under the general laws, and derive their powers and franchises from the state, and, though a consolidation between them might result in exclusive business control of a particular territory, it does not give any monopoly

there in the legal sense, since any one is free to obtain a charter for a like purpose, and can compete with them there, if the municipal authorities, to whose control the whole matter is really committed, think it to the public interest to allow the use of the streets and roads for that purpose. Consolidation of enterprises thus engaged, authorized by the Legislature, or the control of two corporations so engaged by the same individual, when permitted by the law does not constitute such a monopoly as is condemned by the common law, even were our statutes controlling that matter here out of the way.

We concluded that the contract here would not violate the public policy of the state, if it had been for a purchase by the Montgomery Light & Water Power Company, instead of Doherty & Co. of the shares of the Citizens' Light, Heat & Power Company.

[3] But this is not the case. Doherty & Co. are natural persons, and there is no law of Alabama which prevents, if it be within legislative competency to prevent, the same person from purchasing and holding stock in two or more corporations at the same time, and thus controlling them, though such corporations compete with each other.

[4] The shareholders are the owners of the corporate property in equity. When the corporation is dissolved and its debts paid, the former corporate property belongs to them as individuals, and, while the corporation exists and does business, the shareholders are entitled to control its affairs, in the proportion to the number of their shares, through the instrumentalities which the laws provide for their management. The investment in corporate property in the United States amounts to billions of dollars. The shares in them form the basis of a great proportion of the banking and financial operations of the country. The sale or the hypothecation of shares is the only mode by which stockholders can avail themselves of their interest in the corporation to obtain money or credit on them. These shares are property in the fullest sense of the term. Contracts concerning them are protected by all the sanctions which the Constitution throws around other contracts.

[5] A court of equity cannot refuse to enforce a bona fide contract for the sale of actual stock, where it would decree specific performance if the contract related to any other kind of personal property, without turning its back on one of its most conservative and ancient remedies, and shaking confidence in the value of investments in corporate stock. Property rights, public and private morality and liberty itself, are insecure when the law fails to give effective remedy for the enforcement of a contract obligation.

The doctrine that a contract for the sale of corporate shares of stock will not be enforced if the purchaser desires thereby to gain control of a corporation, whether or not competition is involved, has received recognition in only two or three states of the Union. All these cases are based on Foll's Appeal, 91 Pa. 434, 36 Am. Rep. 671, which has since been repudiated in the state which gave birth to the doctrine. See Carpenter's Estate, 170 Pa. 203, 32 Atl. 637, 29 L. R. A. 145, 50 Am. St. Rep. 765; Bald Eagle R. R. Co. v. Nittany R. R. Co., 171 Pa. 294, 33 Atl. 239, 29 L. R. A. 423, 50 Am. St. Rep. 807. Foll's

Case is distinctly and finally repudiated in Northern Central R. R. Co. v. Walworth, 193 Pa. 207, 44 Atl. 253, 74 Am. St. Rep. 683. This last case is on all fours in principle with this case, and a strong authority in behalf of complainants' right to have specific performance of the contract here.

The contract here not being illegal or offensive to public policy, it remains to consider whether for any other reason it is such a contract as ought not to be specifically enforced under the settled rules of equity.

[6] The contract has been concluded, and is certain and unambiguous in its terms. It is not shown that the complainants have breached it. It is not alleged that it was induced by mistake or fraud. It was made upon a valuable consideration, and, for aught that appears now, is fair in all its parts, and is not a hard bargain. Coercing performance would not be oppressive to defendants, and it is capable of enforcement by a single decree. The contract possessing these conditions and incidents, the right of the complainants in equity to the stock is perfect, as the case is now presented, after their tender of performance, and the court has no discretion to refuse the remedy of specific performance. The objection of want of mutuality of remedy in the sense in which equity uses those terms no longer exists.

[7] Complainants seeking specific performance offer to perform on their part and unreservedly submit themselves to the court to decree whatever may be proper in enforcing the rights of the other party to the contract. If defendants accept their offer, complainants cannot afterwards retract it, and thus escape a decree in favor of the defendants. If, on the other hand, defendants refuse the offer, and unsuccessfully resist specific performance, they cannot be compelled to perform unless performance of every stipulation of the contract for their benefit is likewise coerced from complainants. In either event complete enforcement of the legal and equitable rights of the parties will be effected by one comprehensive decree, and the defendant cannot be remitted to a court of law for the enforcement of any of their rights. Jenkins v. Harrison, 66 Ala. 345; Hooper v. S. & N. A. R. R. Co., 69 Ala. 529; 6 Pomeroy's Equity Jur. §§ 769, 770; Miller v. L. & N. R. R. Co., 83 Ala. 278, 4 South. 842, 3 Am. St. Rep. 722. The ability of Doherty & Co. to pay the consideration named in the contract is denied in some of the affidavits, but on the whole proof the court has no doubt whatever of their ability to perform. If the defendants have anxiety on that account, acceptance of the offer to perform and the failure of the complainants within due time to perform would speedily result in a decree against them, or, at the option of the defendants a decree that the contract had been rescinded by their default, and a consequent dismissal of the complainants' bill.

[8] The conduct of Rice in leaving the jurisdiction and withdrawing power from his attorney to act for him rendered immediate tender to Rice impossible. Complainants, asking and tendering performance and submitting themselves unreservedly to the jurisdiction of the court, did all in their power to perform and to perfect their right and title to the stock in dispute. They became the equitable own-

ers of the stock, and, until final decree, they must be so regarded in measuring their rights in the various stages of the litigation, unless, meantime, defendants regain their right to the stock by offering to accept performance, and complainants then fail to perform. It necessarily follows that in gauging the relative rights of the parties against each other in the present stages of the litigation the stock in dispute must be treated in equity and good conscience as the property of complainants, and not of Tillis.

[9] Tillis holds the naked, legal title, the whole equitable estate being in the complainants, and, as trustee for them of the stock, he is bound as are all other trustees not to use it for his own gain or advantage, or to the detriment of the interests of his cestuis que trust. More than that, he is trustee in his own wrong, obtaining the legal title to the stock with full knowledge of the contract with complainants by combination with Rice to defeat the consummation of that contract, and has indemnified him against damage for breach of it in order to get the transfer of the stock to himself. He thus volunteered to meddle with trust property and stepped in Rice's shoes, and, as far as he could, became his substitute. In discussing his rights we may for the present well leave out of sight the transfer to Tillis, and treat him just as though he were Rice; for certainly Tillis cannot assert any right against complainants which Rice cannot. Both are trustees for complainants, and equity charges their consciences not to deal with the stock, save to transfer the legal title to the real owner on the stock books of the company which issued it, and forbade their use of the corporate power of the light companies in such a manner as to impede the consummation of the contract with the complainants or to deprive them of its fruits.

Complainants bargained with Rice for eight-tenths of the outstanding stock of the corporations, whose debts were not supposed to exceed $75,000, which complainants contracted to pay subject to a bonded indebtedness of $50,000. Complainants did not bargain with Rice for eight-eighteenths of the stock in a corporation whose property they as minority stockholders could not keep from being loaded down with the issue of nine times more bonds than were outstanding at the time of the purchase. It is too plain to be disputed that a court of equity can never permit Rice himself to use the stock he sold complainants to defeat performance by Rice of that contract, or as the means of introducing new stockholders by issuing new stock to pay debts which complainants had already contracted to pay, in order that complainants would be minority stockholders. Tillis has with Rice's connivance, and for purposes of his own, substituted himself in the place of Rice in the litigation and stands in his shoes here. Any decree which may be proper against Rice will be proper against Tillis, save as to the details concerning the new stock.

[10] Regarding the contention of respondents that as the voting of the shares which complainants bargained for was vested in the trustees, and therefore complainants could not vote the shares of stock themselves, even if they obtained a decree of specific performance, little need be said at this time. The depositaries of the power to vote

this stock are trustees in the strictest sense. If decree should go annulling the sale to Tillis and directing the corporation to transfer the shares to complainants on the stock book, and these trustees should afterwards use their voting power to the detriment or in hostility to the interest of the persons adjudged to be the owners of the shares, the trustees would commit a breach of trust, for which a court of equity would remove them, and, as a court of equity never allows a trust to fail for the want of a trustee, it would appoint others in their stead. This feature of the case presents no obstacle to an effective decree of specific performance, if it be proper on final hearing. As to it, we may well quote the language of the Chief Justice in Union Pacific R. R. Co. v. Chicago, etc., R. R. Co., 163 U. S. 600, 16 Sup. Ct. 1187, 41 L. Ed. 265:

"The jurisdiction of courts of equity to decree the specific performance of agreements is of a very ancient date, and rests on grounds of inadequacy and incompleteness of the remedy at law. Its exercise prevents the intolerable travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damage for the breach. It must not be forgotten that in the increasing complexities of modern business equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies so that they should correspond both to the primary rights of the injured party and to the wrong by which that right has been violated, and has always preserved elements of flexibility and expansiveness so that new ones may be invented or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed."

It must be borne in mind in measuring the rights of the parties at this stage of the proceedings that this is in no proper sense a struggle between factions of stockholders of a corporation to control its policies, but in its last analysis is nothing but an effort on the part of the real owner of the stock, as the case is now presented, to prevent one who is not the owner of the stock, and who volunteered to thrust himself in between Rice and the complainants, to defeat complainants' rights from depriving the true owners by the aid of a hostile board of directors of recognition as shareholders, ignoring their rights as such in the management of the corporate property, and frustrating the orders which the court made for the preservation of the status of the stock as it existed before Rice transferred it. Tillis is not in any position to complain of any order which the court may make restricting the use of the shares purchased from Rice, or those subsequently acquired by the new issue, or restraining the acts of the light corporation pending final decree. His present attitude is inequitable, and it is meet that he should do equity. Complainants cannot wrest the disputed stock from him except upon payment to him of the amount they contracted to pay Rice, which is a much greater sum than his advances and subscription to stock. By thrusting himself into the controversy between Rice and the complainants and directing the corporate powers of the light company, he can wage his contention with complainants, secure against loss if he fails; and yet be in position, if complainants finally succeed, to use the powers of the corporate organizations meanwhile to impede enforcement of complainants'

rights and burden the value of the interest complainants purchased by making unnecessary and reckless contracts which the corporations would be bound to carry out even at a loss, no matter who is finally decreed to be owner of the stock, and thus inflict injury on complainants without risk of loss to himself if he is defeated in the suit, and by such methods so to change the situation and the value of complainants' investment as to induce them finally to abandon insistence for specific performance, and thereby effect his purpose to nullify complainants' contract with Rice. Complainants earnestly insist that such is his purpose, and cite as one of the proofs of it that the light company has recently contracted to pay its manager who has heretofore served for $1,800 a year a salary of $6,000 per annum in the future for practically the same duties as performed in the past; while the respondents insist the amount of the salary was but proper provision for an officer who had rendered faithful service in the past at an inadequate compensation, in view of the contemplated enlargement of its operations. The court does not find it necessary now to consider this and other acts which complainants insist show a studied purpose to prevent complainants if they finally succeed from obtaining the legitimate fruits of their contract.

[11] It is urged, however, that in enforcing to the extent prayed here, as against Tillis, the rights complainants might have against Rice, in whose shoes Tillis stands, the court will transgress the rights of the light company and usurp the discretion of its board of directors and harm the public interest by the stoppage pendente lite of the contemplated improvements. But what is the situation as to which this contention is made? Complainants were the equitable owners of the majority of the stock when Rice combined with Tillis to defeat complainants' acquisition of the legal title. Some of the directors of the light company were put in office for the very purpose of defeating the rights of complainants. Tillis according to his own affidavit, sought to acquire "absolute control," and the facts show that he has obtained it. One of the six directors now in office is the trusted friend, to whom Tillis confided his plans and purposes, and who conducted his negotiations for him. Another is Rice's attorney, who for two weeks before the date set for the performance of the contract with complainants was seeking to break it and negotiating with Tillis to induce him to become the purchaser of the very stock. Another is an important officer of the light company, who was so anxious to break the contract with complainants and have Tillis to acquire the stock that, notwithstanding an injunction was served upon him preventing the transfer of the stock by Rice, before it was transferred, did everything in his power afterwards to consummate it, as he says, "on the advice of counsel." Another is an employé of the light company. The remaining directors have long been associates of Rice. They sympathized in his trials in the conduct of the light company, and participate in his antipathy to complainants, who were charged with instigating litigation against the light company and seeking its ruin. Although they knew that Rice had sold the stock, their own included by their authority, they participated in the meeting on the night of the 16th of June, and elected two new directors whom Tillis desired. None of the di-

rectors have paid or are expected to pay anything for the one share of stock which stands in each of their names on the stock books with an indorsement in blank on the back of it.

The proof shows that on June 15th last the light company was on the verge of collapse, and its credit entirely gone. That enterprise had been conducted for several years under fierce competition, and it had incurred debts, including its bonded debt, of a much larger amount than the total capital paid into the enterprise. It had never declared a dividend. Some of the directors had strained their credit in carrying paper for it in the banks. The evidence strongly tends to show that after Tillis paid his subscription for $80,000 of stock, and made some further advances, that the business under the new management has not made any profit. The Citizens' Light, Heat & Power Company has now sold all of its authorized capital stock with the exception of $70,000, which has no market value, and which Mr. Tillis testified nobody wanted but himself or the complainants. The proposed issue of bonds would further reduce its value, and it can hardly be counted as an asset for raising money. The only other resource is the issue of mortgage bonds upon the property. Tillis says he proposes to aid the company in financing these bonds, but whether he does or not, or whether he takes the bonds himself or they are sold to another, the debts thus incurred will more than treble the present value of the corporate property. It is matter of common knowledge in this community that, wherever the two companies have heretofore come in contact, there has been little, if any, profit, in the venture, and frequently the business has been done far below cost. It is not reasonable to expect different results if the enlargement of the plant be made and consequent broadening of contact, and, if the venture is unprofitable, the value of the stock will be destroyed. The competitor of the light company from whom the business must be wrested upon terms which would make the enlargement of the plant at all profitable generates electrical current by water power, which the weight of the expert testimony shows can be produced considerably cheaper than the current produced by steam power, as is the case with the present and contemplated plant of the respondent company. The traction company is the largest consumer of power in this city, and the contract for it is with the Montgomery Light & Water Power Company and does not expire for some years. The latter company has also the light contract with the city, which does not expire for two years or more. There has not been much increase in the demand for light and power this year, and it is not probable that the demand will increase for months to come.

The Montgomery Light & Water Power Company has an invested capital in the light and power business of nearly $1,500,000, and supplies about three-fourths of the demand for light and power in the community, while the operations of the respondent companies thus far have been restricted to a comparatively narrow area in the city. It would be years before respondent companies, if they succeeded in the end, could derive any profit from business, owing to the enlarged competition, which is the justification for the proposed enlargement of the plant. In view of these considerations, the contemplated en-

largement of the plant and consequent increase of respondent's indebtedness to raise the money is a very reckless speculation. Upon the case as it now stands, we repeat, complainants must be treated as the owners of the stock, and not Tillis. A board of directors which he controls ignores the interest of those who may be the owners of the shares, refuses to recognize them as stockholders, and, though the question who owns this stock will be speedily decided in the courts, insists upon making an enlargement regardless of its effect upon the interest of the true owner who may turn out to be the complainants, and not Tillis.

[12] It is the duty of the board of directors to manage the corporate affairs solely in the interest of the corporation, quite regardless of the effect of its policies and management upon the fortunes of individual stockholders in the corporation. The determination under these circumstances to enlarge the plant with the ruinous consequences it may involve to stockholders displays such recklessness and indifference to the interest of the true owners as is the equivalent of willful breach of trust. As said in Kessler & Co. v. Ensley Co. et al. (C. C.) 129 Fed. 408:

"Although equity will not remove a director who is a statutory fiduciary, as it would an ordinary trustee, it will not hesitate in a proper case to enjoin a director or to set aside acts of misconduct, amounting to a breach of trust, which oppress stockholders and militate against the well-being of the corporation."

It was further said in that case:

"That when all disinterested and fair men upon the facts upon which the directors' action is challenged would reach the conclusion that their decision was improper and prejudicial to corporate interest, and was not the result of their unbiased judgment, which had been deflected for some extraneous reason, the court cannot refuse to intervene, although the directors may have been honest."

The ordinary man with a reasonable sense of fairness, finding himself in charge of property to which different individuals lay claim of ownership, would not generally resist the justice of an appeal by a claimant who was out of possession not to deal with the property as though it were the property of the other claimant, and enforce his policies, it may be, to the ruin of his adversary, when there was no pressing necessity to act, when the rights of the parties in and to the property were before the court, and would be speedily decided, and no great harm could come to the property from managing it in the immediate future as it had been managed in the past. No man can read the record before the court in view of the history of this transaction, as thus disclosed, and avoid the conclusion that the directory is a partisan of Tillis, and hostile to complainants, and is doing what it can to defeat their success in this suit. Its judgment is not unbiased. Their acts amount to a settlement by Tillis himself of the conflicting rights which the complainants are seeking to enforce. In this complexion of the situation the determination of the board of directors does not commend itself to the conscience of the chancellor, and the court must view the question according to its own independent judgment.

As observed in Pomeroy's Equity Jurisprudence (Ed. 1892) § 1079:

"It is well settled that every violation of a duty by a trustee which equity lays upon him, whether willful or fraudulent, or done through negligence or arising through mere oversight or forgetfulness, is a breach of trust. The term furthermore includes every omission or commission which violates in any manner either of the three great obligations already described of carrying out the trust according to its terms of care and diligence in protecting and investing the trust property, and of using perfect good faith. This broad conception of breach of trust and the liabilities created thereby are not confined to trustees regularly and legally appointed. They extend to all persons who are acting trustees or who meddle with trust property."

Leaving aside the question whether the public is benefited in the end by seasons of fierce competition which always result in the stronger enterprise swallowing the weaker, or at least a combination between them whereby the business is continued under one management, which invariably recoups the losses sustained in the struggle by exacting higher rates in the future, there is nothing in the situation which would imperil or harm the public interest from the court's maintaining the status quo as fixed by the orders heretofore made, and by those which will be made on awarding a preliminary injunction. The light company is left entirely free to continue its business as it has in the past, and not a single consumer now served by it will be disturbed nor the area of its business curtailed. The evidence shows that its present plant generates a considerably larger supply of electric current than is needed to supply its present customers, and it is free to use it in gaining new customers or meeting enlarged demands. The orders will not disturb its operations as they have been conducted for the last four years. No contracts have been made for supplying anything for the contemplated enlargement of the plant. The details of the plans concerning it have yet to be determined and passed upon by an engineer, and specifications made, and not till then could orders be given, even if the court did not prevent the incurring of expenditures for that purpose. Long before any order could be placed the case will be passed upon in the Court of Appeals, and waiting until then will not entail delay at all harmful. The only contract so far made regarding the enlargement of the plant is with a civil engineer, who contracts to advise and supervise plans upon a commission whenever entrusted with the duty, and respondents are not even bound under that contract to undertake the improvements. According to the testimony, the only thing done under it has been a visit of one or two gentlemen for a day to look into the situation. Preventing the placing of the orders pendente lite will not harm the respondents, and, if they are inconvenienced thereby, it is the unavoidable result of Tillis thrusting himself into the litigation and controlling and shaping the policy of the directory to defeat the rights of complainants.

It is a gratification to know, if the court errs in holding that complainants are entitled to a preliminary injunction, its error can be corrected in less than 90 days by the Court of Appeals which meets here next month. If it decides that the contract here is not such a one as can or ought to be enforced in equity, the confusion in the affairs of the light company, which would not have occurred but for the intervention of Tillis in its affairs, will be speedily ended. If, on the

other hand, the Court of Appeals should hold that complainants' contract should be enforced in equity, it would manifestly be most inequitable to allow the light company or its board of directors, which is controlled by Tillis, and who are hostile to the rights of complainants, to direct its affairs pending the litigation so as to deprive the complainants of the fruits of their contract or jeopardize them.

A preliminary injunction will issue in accordance with this opinion. Counsel for complainants may prepare a draft of the order and submit it to counsel for respondents, and the court will then settle its terms.