## CHARLES A. PETERSON AND ANOTHER v. JOHNSON NUT COMPANY.[1]

January 20, 1939.

No. 31,893.

[1]Reported in 283 N. W. 561.

302

*Malmberg & Nelson* and *Kingman, Cross, Morley, Cant & Taylor,* for appellants.

*Chester W. Johnson* and *Dan J. O'Connell,* for respondent.

JULIUS J. OLSON, JUSTICE.

This was a suit to enjoin defendant from competing with either plaintiff in the business of manufacturing and selling salted nut meats and related products in certain described areas. When plaintiffs rested, the court, on defendant's motion, dismissed the suit. Plaintiffs appeal from an order denying their motion for new trial.

In 1922 plaintiff Peterson, one Johnson, and another incorporated defendant. The two named persons were its principal stockholders and in active charge of its management. Its main office then was and still remains in Minneapolis.

Defendant's business prospered. Within a few years it had customers in nearly all the states of the Union and in Canada. In May, 1926, because of its increased volume of business, its owners decided to open a branch in Cleveland. Thereafter all of defendant's customers located, with certain exceptions not material here, east of the Mississippi river in the United States, and east of Port Arthur in Canada were served from the Cleveland branch; its other customers were served, as before, from the Minneapolis office.

In January, 1927, Peterson sold his stock in defendant company to Johnson and at the same time took an option to purchase the business of the Cleveland branch. At that time Peterson owned 32 per cent of defendant's stock and Johnson 60 per cent thereof. The option was exercised, and on February 10 the sale was consummated. The cash consideration was in excess of $87,000, and in addition he assumed other obligations amounting to about $7,500. Peterson testified that he valued the good will of the business so acquired at $30,000. The contract contained a covenant giving Peterson the exclusive right to use the patents and patent rights included in the purchase in the territorial area identical with that of the Cleveland branch. Defendant covenanted not to compete in the granted territory "directly or indirectly." Peterson on his part agreed not to enter into competition with defendant in any territory not specifically granted to him. This is the covenant on defendant's part forming the basis of the present suit.

The contract also provided that inasmuch as Peterson contemplated organizing a corporation to carry on the business of the Cleveland branch he was specifically authorized to assign his contract rights to the new corporation upon its assumption of his duties and liabilities thereunder, but such assumption was not to release him. In February he organized the new corporation under Ohio law and named it "The Peterson Nut Company." This may be referred to as company No. 2. The contract was duly assigned, Peterson's rights and obligations thereunder were assumed, and the business was thereafter carried on by that company until August, 1934, when it was adjudicated a bankrupt in involuntary proceedings. Its business was carried on during these proceedings by its receiver and for a short time by its trustee. On November 8 all of its assets, except accounts receivable, were sold by the trustee to one Schiele of Cleveland for $3,613.10. The assets so sold included "Good will, Trade name, Patents, Copyrights, Stationery, Printed Cartons [consideration]—$255.00." The covenant not to compete was not scheduled in the bankruptcy proceedings, nor was it expressly listed as such in the trustee's bill of sale.

Schiele purchased the assets on behalf of himself, plaintiff Peterson, and one Erk. It was intended by these parties to form a new corporation to take over and operate the business of company No. 2. Such corporation was duly formed under the identical name of its predecessor, the present corporate plaintiff, hereafter referred to as company No. 3. Schiele transferred the purchased assets to it, expressly including its good will. But no specific assignment otherwise was made of the covenant not to compete.

In October, 1935, Peterson severed his association with company No. 3 and since has engaged in the same line of business through the medium of other corporations. Nearly all of the stock of plaintiff company is now held by one Teschner as security for a loan granted to the party presently conducting its corporate affairs. Its original incorporators are no longer connected with it.

In September, 1937, defendant commenced to sell its products in the territory which by the contract it had agreed not to enter. Promptly thereafter Peterson and company No. 3, the plaintiffs, commenced this suit and obtained a temporary injunction. At the conclusion of plaintiffs' case the suit was dismissed on defendant's motion. The basis therefor appears in the record as follows:

"I don't think there is any question, gentlemen, but what there is no restraint of trade in this contract. And the question of damages I think has been disposed of. But * * * my impression is that Peterson has divested himself of all of his rights under the contract; and that Corporation No. 2, to whom he assigned the contract, has also divested itself of all rights under the contract; and that Corporation No. 3 has no right to enforce the contract; and I therefore grant the motion to dismiss."

Later the court by written order dismissed the suit on its merits. Plaintiffs' motion for new trial was denied, but the court continued the preliminary restraining order pending determination of the controversy by this court.

The claim is made that injunctive relief should be denied because irreparable injury to plaintiffs is not likely to follow from a breach of the covenant. In determining whether a breach of a

negative covenant not to compete can be enjoined care must be taken to observe the subject matter of the contract and the relationship of the parties thereto. Different requirements with respect to damage exist depending upon whether the agreement not to compete is between employer-employe, professional men, or business organizations. Thus it has been generally held that irreparable injury, actual or threatened, must be shown before the employe, who has covenanted not to compete after his term of employment, will be enjoined. The Menter Co. v. Brock, 147 Minn. 407, 409-410, 180 N. W. 553, 20 A. L. R. 857; Simms v. Burnette, 55 Fla. 702, 46 So. 90, 16 L.R.A.(N.S.) 389, 127 A. S. R. 201, 15 Ann. Cas. 690; see 16 Minn. L. Rev. 316. But, as we shall see, cases of this character, though cited, are not relevant here. Where an established business has been sold with its good will and there is a valid covenant not to compete in certain territory, in this state and others, the breach is regarded as the controlling factor, and relief follows almost as a matter of course. Holliston v. Ernston, 124 Minn. 49, 52, 144 N. W. 415; Andrews v. Kingsbury, 112 Ill. App. 518 (affirmed, 212 Ill. 97, 72 N. E. 11) ; Emrick v. Groome (1895) 4 Pa. Dist. Rep. 511; Brown v. Kling, 101 Cal. 295, 35 P. 995; see 17 Minn. L. Rev. 444; note, 15 Ann. Cas. 696. Furthermore,

"It would seem that defendants should not be greatly concerned in these matters [damage to plaintiff]; for, having received a consideration for the contract the important question is its breach, and it is clear that plaintiff has an interest therein. * * * Violation of a negative covenant such as this is deemed a sufficient ground for interference, and injunctions are freely granted almost as a matter of course in such and analogous cases." (124 Minn. 52, 144 N. W. 416.)

While in this case the good will and the other items mentioned brought only $255 at the trustee's sale, yet such sales are frequently (perhaps one may say generally) characterized by great sacrifice of values. Such sale price in and of itself should not be regarded as controlling. Since this sale the business acquired thereby has been conducted and arrangements for refinancing have been made.

We think, under the circumstances here appearing, that the damage naturally resulting from defendant's breach is sufficient to justify injunctive relief. Defendant is only being required to perform a contractual duty which it voluntarily undertook to perform for a very substantial consideration accepted and retained by it. The law, we think properly, looks with disfavor upon attempts to avoid the consequences of a contract deliberately made to accomplish a lawful purpose. The damages are of a nature not easily ascertainable with any degree of certainty, and a single action for damages obviously would not afford complete redress. After all, "why should the court, being able to make the delinquent defendant live up to his obligations, hesitate to do so because they would place him in a position in which he has expressly agreed to place himself?" Lewis, 42 Am. L. Reg. (N. S.) [51 O. S.] 591, 629. The trial court was of opinion that the factor of damage was not a barrier to relief. We believe its conclusion is entirely consistent with the law of this state and with common sense as well.

■ Lack of mutuality of remedy is another reason assigned as a basis for denial of relief. The basis for this is that defendant should not be enjoined because if it had sought to enjoin plaintiff corporation failure would follow since no duty was imposed upon it to refrain from entering into defendant's reserved territory. Thus defendant seeks to avoid its contractual duty through the assertion of the so-called negative doctrine of mutuality. Durfee, 20 Mich. L. Rev. 289. Mutuality of remedy may not be present, but we do not think that alone furnishes justification for denying relief upon the facts here presented. The difficulty with defendant's argument is that it asks the court to decide the case not by "dealing with equities of the different parties as they actually are," but to deny "the equity of plaintiff because, under a hypothetical state of facts, defendant would not have a similar equity." McClintock, Equity, § 66, p. 116.

The exact status of the doctrine of mutuality of remedy was, "prior to the present century, * * * an unsolved puzzle." And the "plausibility of the doctrine served to keep it alive, even to this day." Durfee, 20 Mich. L. Rev. 289. But in recent years much

criticism of the old doctrine has arisen, and rightly so. Many of the cases *pro* and *con* are found in Lewis, 42 Am. L. Reg. (N. S.) [51 O. S.] 591 (in which the author concludes that in nearly all cases where this doctrine was applied manifest injustice resulted); Ames, 3 Col. L. Rev. 1; McClintock, Equity, § 66, p. 114; Durfee, 20 Mich. L. Rev. 289; see Stone, 16 Col. L. Rev. 443, 446, where the author says:

"By serving his complaint and asking the court to compel the defendant to perform his contract, the plaintiff submits to the jurisdiction of the court, and may be compelled to perform the contract on his part. There is thus no want of mutuality of remedy, and the court will compel specific performance of the whole contract."

And again (p. 455):

"Want of mutuality of remedy does not deprive a court of its jurisdiction, but is addressed only to the discretion of the court."

The supporting cases are found under notes 28 and 40.

This court early expressed a flexible principle consonant with the more modern principles of equity. In Lamprey v. St. P. & C. Ry. Co. 89 Minn. 187, 192, 94 N. W. 555, 557, it was said in answer to a similar contention to that advanced here:

"The early equity doctrine that, if the right to specific performance of a contract exists at all, it must be mutual, was based largely upon notions of expediency, rather than upon any principle of abstract justice, and has been materially modified. The doctrine of this court is that, if a contract for the conveyance of real estate is supported by a valid consideration, and there is no other good reason why it should not be specifically enforced except the want of mutuality of remedy, it will be so enforced."

Again, in First Nat. Bank v. Corporation Sec. Co. 128 Minn. 341, 346, 347, 150 N. W. 1084, 1086, this court said, quoting with approval from Henry L. Doherty & Co. v. Rice (5 Cir.) 186 F. 204, 213:

" 'The objection of want of mutuality of remedy in the sense in which equity uses those terms no longer exists. Complainants seeking specific performance offer to perform on their part and unreservedly submit themselves to the court to decree whatever may be proper in enforcing the rights of the other party to the contract. * * *' Moreover, equity no longer regards this ancient maxim as inviolate where its application would accomplish injustice."

(The doctrine of these cases was not repudiated nor limited by Reichert v. Pure Oil Co. 164 Minn. 252, 259-260, 204 N. W. 882, 884, for that decision was based upon the ground that "equity will not decree performance of a continuing contract which one of the parties can terminate at will"; hence, "unless there is a mutuality of remedy at the time coercion is sought so that the decree will bind both parties and accomplish a full performance of the contract, the court refuses to exert its equitable powers and leaves the parties to their remedy at law.")

The correct rule to be applied is, we think, that injunction will lie if the court can by its decree assure the parties that its operative effect will be wholly without injustice or oppression to either party. This is the principle adopted in the leading case of Epstein v. Gluckin, 233 N. Y. 490, 135 N. E. 861, followed in Weinberger v. Van Hessen, 260 N. Y. 294, 183 N. E. 429. Mutuality of remedy and of performance are elements to be considered in balancing the equities to determine whether relief should be granted. Durfee, "Mutuality in Specific Performance," 20 Mich. L. Rev. 289, 312. This presents a flexible standard which is consistent with the purposes of the equitable powers possessed by the court; and, while certainty is sacrificed in a limited way, yet—

"Every attempt to reduce the law in a given field to a rule which can be applied automatically to really new situations by the processes of deductive logic, is of necessity foredoomed to failure. In the words of Mr. Justice Holmes, 'But certainty generally is illusion, and repose is not the destiny of man.' " W. W. Cook, 36 Yale L. J. 897, 912.

The contract should be considered in all of its parts, the rights and obligations of plaintiffs as well as those of defendant. And,—

"So far as practicable, both parties should be required to perform their obligations at the same time; and if simultaneous performance is impracticable the court should either enforce the contract upon terms which will give defendant some assurance of future performance by plaintiff, or refuse to enforce the contract at all— whichever is the more just, considering the situation of both parties.

"In terms of equitable maxims, the principle is not that equality is equity, but that he who seeks equity must do equity, and that equity delights to do justice, and not by halves." 20 Mich. L. Rev. 294.

Nor should courts permit the doctrine of mutuality to become a "sanctuary for contract breakers." (*Id.* p. 298.)

The reason why defendant should be compelled to respect its contract obligations is well stated by Judge Sanborn in Beckwith v. Clark (8 Cir.) 188 F. 171, 178:

"The compulsory performance of it [the contract] and the terms of the decree therefore rest in the sound judicial discretion of the chancellor which should be exercised to attain this object. All the rules which have been established for the molding of decrees have been framed and followed and all the exceptions to them have come into being to accomplish this purpose and are subordinate to its attainment."

Adequate relief can be granted in this case and made operative without oppression or hardship upon either or any of the parties. A decree can, and should, be so entered as to afford all parties complete equitable relief, giving and bestowing upon each and all litigants the full benefit of performance according to the terms of the contract. The assignee (corporate plaintiff) by the very act of invoking the aid of equitable powers of the court assumes the duty of performance and thereby subjects itself to any proper conditions imposed by the court in granting relief. Epstein v. Gluckin, *supra;* 5 Williston, Contracts (Rev. ed.) § 1439A, p. 4021, and cases

under note 2. And as the individual plaintiff has joined in the suit he too will necessarily be bound by the decree. It is proper to mention that Restatement, Contracts, § 372(1), rejects the mutuality of remedy doctrine. The rule is stated in § 373 as follows:

"Specific enforcement may properly be refused if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court."

■ Peterson's bankruptcy and that of company No. 2 are said to have effected a termination of the involved contract as a matter of law. Defendant's claim in this respect is based principally upon Stern v. Mayer, 166 Minn. 346, 207 N. W. 737, 46 A. L. R. 1167, and Central Trust Co. v. Chicago Auditorium Assn. 240 U. S. 581, 36 S. Ct. 412, 60 L. ed. 811.

The facts in the Stern case were these: Defendant had entered into an executory contract with the U. S. I. Realty Company to purchase five shares of its capital stock. Only a part of the purchase money had been paid when the realty company became bankrupt. Action was brought by its trustee to recover the balance. Defendant's general demurrer was sustained. This court on appeal affirmed because "the character of this contract and the effect of the bankruptcy result in a complete destruction of the subject matter which makes performance impossible." (166 Minn. 353.) In the Central Trust Company case respondent had granted to a transfer company, covering a term of years, the exclusive right "to transfer baggage and carry passengers to and from the hotel and to furnish livery to its guests and patrons." (240 U. S. 586.) Considerable capital outlay had been made by the transfer company to qualify for the performance of its part of the contract. While the contract was in full force and effect and was being performed in a satisfactory manner by the parties, the transfer company was adjudicated a bankrupt. The trust company was appointed trustee of the bankrupt's estate. Respondent association presented a claim against the bankrupt's estate, claiming damages in an amount in excess of $6,500, more than $6,000 of which was for alleged un-

liquidated damages arising under the contract for its anticipatory breach caused solely by the bankruptcy. The court held that bankruptcy was such anticipatory breach and that the solvent party had a right to prove its claim in the bankruptcy proceedings. The court said (240 U. S. 590): "The immediate effect of bankruptcy was to strip the company of its assets, and thus disable it from performing." And (240 U. S. 591): "It must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance; and, in this view, bankruptcy proceedings are but the natural and legal consequence of something done or omitted to be done by the bankrupt, in violation of his engagement." That the result reached in each of these cases was right no one will deny. But some of the broad statements made by the court in the federal case have been disapproved by many eminent writers in the fields of bankruptcy and contract law. The basis for the criticism is the apparent holding that bankruptcy is, in and of itself, an anticipatory breach of every executory contract. We do not think the criticism is entirely justified, for one must recognize that the court was speaking in relation to the facts as they there appeared, and the chosen language necessarily must be viewed in the light of the facts concerning which the discussion relates. An interesting and instructive article is Wardrop, "Prospective Inability in the Law of Contracts," 20 Minn. L. Rev. 380. In 5 Williston, Contracts (Rev. ed.) § 1327, p. 3731, the author has this to say: "It can hardly be supposed that the Supreme Court will hold that bankruptcy involves all of the consequences of anticipatory repudiation, and for this reason, supported by decisions of lower federal courts, the Restatement of Contracts states that insolvency is not an anticipatory breach and bankruptcy 'does not have all the effect of such a breach.'" And referring to the Restatement (§ 324) we find: "Insolvency of a promisor is not an anticipatory breach, and his bankruptcy does not have all the effect of such a breach," under all circumstances. Under comment a the Restatement reads:

312

"The trustee in bankruptcy may adopt the bankrupt's contract and by fulfilling the bankrupt's duties under the contract, acquire his rights; and the other party must give the trustee a reasonable time to determine whether he will do this. No such requirement exists with reference to an ordinary anticipatory breach. Moreover, situations arise where there is little analogy between bankruptcy and anticipatory breach, as where the nature of the contract is such that the claim is not provable, * * *"

Company No. 2 was a party to the bilateral contract containing the concurrent conditions. That company had no duty to perform requiring affirmative action on its part. Inactivity on its part in the restricted area given to defendant was the mandatory standard of its conduct. Obviously, then, bankruptcy did not as a matter of fact breach this covenant. Nor could lack of cash or physical assets on its part have anything to do therewith. As a matter of fact, lack of financial ability was more likely to induce its continued performance by staying out of such restricted area. Compare In re United Cigar Stores Co. (2 Cir.) 72 F. (2d) 673.

We are therefore of opinion that neither the bankruptcy of Peterson nor that of company No. 2, upon this record, justifies a finding that there was an anticipatory breach of the mutual covenant here involved.

■ The primary purpose of bankruptcy legislation was originally "to effect an equitable distribution of the bankrupt's property among his creditors, and this is still regarded by the courts as the law's primary object." Likewise, "it is also the purpose of the Bankruptcy Act, so far as may be, to preserve existing business relations, and not to upset them or interfere with fundamental incidents thereof which have been long recognized by the common law." 6 Am. Jur., Bankruptcy, § 1.

■ Claims *ex contractu* under the act (11 USCA, § 103 [a] [5]) may be proved and allowed against the bankrupt's estate.

"The contracts from which provable debts may arise within the purview of this provision are express contracts or contracts implied in fact or in law, and do not include obligations imposed by law

where the remedy is other than by action on contract, express or implied." 6 Am. Jur., Bankruptcy, § 106. "Wholly contingent claims are not provable as debts in bankruptcy." The contingency "is one of facts necessary to fasten liability at all, not one of the court's judgment on the facts nor one as to the extent of the damages resulting from the injury. So long as it remains uncertain whether a contract or liability will ever give rise to an actual duty or liability, and there is no means of removing the uncertainty by calculation, it is too contingent to be a provable debt." *Id.* § 118.

■ With the foregoing principles in mind, what was there about this contract that in any way could be made the foundation for monetary liability so as to enrich the assets of the bankrupt? It had done nothing to damage defendant before its bankruptcy nor has any harm come to defendant since. The receiver and trustee of the bankrupt continued its business as a going concern. Schiele, acting for the persons who caused the creation of the present corporate plaintiff, purchased all the estate of the bankrupt, including its "good will." That sale was made pursuant to order of the bankruptcy court. Defendant's claim that there should have been an express assignment of the contractual right, hence that the present corporate plaintiff acquired nothing and is a stranger thereto, cannot be sustained. This court in Haugen v. Sundseth, 106 Minn. 129 (133, where sustaining cases are cited), 118 N. W. 666, 667, 16 Ann. Cas. 259, held that a valid covenant not to compete may be assigned unless by its peculiar nature it cannot be. We think it is apparent that this covenant was entered into for the mutual business advantages of company No. 2 and defendant. Each was to stay out of the other's territory. Upon authority of Haugen v. Sundseth, *supra,* and 2 Williston, Contracts (Rev. ed.) § 412, p. 1181, a covenant of this nature adds to the good will of the business and is transferred with and as a part thereof. Other cases sustaining that view are Sandullo v. La Bruna, 111 N. J. Eq. 4, 160 A. 834; J. L. Davis, Inc. v. Christopher, 219 Ala. 346, 122 So. 406; Burchell v. Capitol City Dairy, Inc. 158 Va. 6, 163 S. E. 81.

■ The mere fact that this contract was not entered in the bankrupt's schedule is immaterial because the title of the bankrupt vests in the trustee of all of his property, not exempt, by virtue of the statute. (11 USCA, § 110[a].) He is bound by the acts, contracts, and conditions of the bankrupt's ownership and has all the rights and is entitled to make all the defenses the bankrupt had. "He stands, under such circumstances, in the shoes of the bankrupt." 6 Am. Jur., Bankruptcy, § 197. Thus, in In re Negri (D. C.) 30 F. (2d) 717, it was held that an unscheduled bank account concealed by the bankrupt does not prevent passing of title to the trustee; similarly, in Gray v. Gudger (5 Cir.) 260 F. 931, a bankrupt's unscheduled life estate was held to have been passed to the trustee and could be sold by him.

■ That the "enforcement of the contract would constitute an unreasonable restraint in trade" is another reason assigned by defendant why it should be absolved from its duty of performance. It cites cases said to hold that contracts interposing a restraint indefinite in point of time are looked upon with disfavor and that "the restraint is greater than necessary for protection" of plaintiff's business. It asserts that plaintiff corporation "for a long time * * * had lain dormant" and "has not shown itself in need of any protection." These objections do not commend themselves to a court of equity coming as they do from one who has accepted a remunerative price for entering into the deal and insists upon its retention. It steadfastly clings to the vast trade area for its exclusive exploitation as far as plaintiffs are concerned, yet insists upon invading the trade area granted to the other party under a solemnly made agreement to which the parties adhered for many years. But all that aside. This court has definitely held that this kind of contract is not to be avoided "where it operates simply to prevent a party from engaging or competing in the same business." Southworth v. Davison, 106 Minn. 119, 121, 122, 118 N. W. 363, 364, 19 L.R.A.(N.S.) 769, 16 Ann. Cas. 253. The "settled modern law" is, on sale of the good will of business establishments, "both in England and in this country, that limitation as to both time and

place is unnecessary, if the agreement in other respects be reasonable, and not in conflict with public policy or the general welfare." And, "it is thoroughly settled that the good will of business concerns is, though intangible, a species of property transferable from hand to hand as other property." The same rule was adopted and applied in Holliston v. Ernston, 124 Minn. 49, 51, 144 N. W. 415, where the court said: "In harmony with modern authority, this court, long ago, adopted the doctrine of reasonableness of restraint as controlling, when neither monopolistic nor within the inhibition of antitrust laws. Arbitrary rules theretofore applied in some jurisdictions were discarded, and the modern doctrine has since been consistently followed and must be considered established." We adhere to the views expressed in the mentioned cases.

█ Misjoinder of parties plaintiff is another attack made by defendant. In considering whether there is a misjoinder, especially in an equity case, it is well to bear in mind that:

"A court of equity will not proceed in an action until it has before it all parties necessary for the full protection of each"; that, "it is the general rule that all persons materially interested, either legally or beneficially, in the subject-matter of the suit, are to be made parties, either as plaintiffs or defendants, however numerous they may be, so that there may be a complete decree that shall bind them all." As to who "shall be made parties in equity is a question of convenience and discretion, rather than of absolute right, to be determined according to the exigencies of the particular case." 5 Dunnell, Minn. Dig. (2 ed. & Supps.) § 7316, and cases cited.

Obviously plaintiff Peterson assumed important and binding duties under his contract, the subject matter of this suit. He stands virtually in much the same position as a guarantor of performance by his assignee. If he were not a party on his own volition it seems reasonably plain that defendant could have compelled him to become such on its motion to that effect. As to whether he is a necessary party, we need not determine. It is sufficient for our purpose to hold, as we do, that he is a proper party. McClintock, Equity, § 9, p. 12.

█ Lastly, it is asserted by defendant that Kelling Nut Company of Chicago is the real party in interest. Obviously that is a fact question and is to be determined as such. It does not appear now as a fact. If the case were to be submitted upon the present record alone this claim stands unsupported.

The order is reversed and cause remanded for further proceedings in harmony with the views herein expressed.

So ordered.

