**HEFLEBOWER et al. v. SAND et al.**
Civil Action No. 1584.

District Court, D. Minnesota,
Fourth Division.

March 28, 1947.

Charles H. Davis, George A. Lewis, and John P. Somers, all of Minneapolis, Minn., for plaintiffs.

Guesmer, Carson & MacGregor, of Minneapolis, Minn., for defendants.

JOYCE, District Judge.

This is an action to enjoin defendants from competing in the beauty supply business for a period of five years within the confines of certain territories. As to defendant Henry Sand, the action is based upon a restrictive covenant contained in a partnership agreement between him and plaintiffs Heflebower and Koch. The remaining individual defendants are joined as fellow conspirators of Henry Sand in an alleged plot to avoid the restrictive covenant and appropriate the former partnership's business by forming the defendant corporation. Plaintiffs also seek $50,000 damages, representing decrease in volume of sales, loss of good will, and depreciation in value of plaintiffs' property right in the business. At the time of service of the summons and complaint herein, plaintiffs moved for a preliminary injunction enjoining further competition during the pendency of this action, which motion was denied. Upon plaintiffs' resting, defendants' motion to dismiss the action was granted as to the individual defendants Alstead, DeMarias, Salzer, Eck, Emma Hadler, George Hadler, Helget and Gunderson.

In 1936 Henry Sand was hired as manager of the Minneapolis branch office of the American Beauty Products Company, an Illinois corporation principally owned and operated by plaintiffs Heflebower and Koch. The American Beauty Products Company, hereinafter referred to as the American Company, supplied products to the beauty business maintaining thirty-five branch offices throughout the United States. It manufactured some of its own products, had others manufactured for it under its own label, and jobbed other lines of beauty supplies. The business was conducted by means of mail order and personal contact of salesmen. The mail order catalogs were sent out from the home office in Chicago to the various territories, each containing the name and address of the branch office serving that territory. In addition to the mail order business, some of the branches also maintained a sales force, which was the case in Minneapolis after 1937. The American Company also had a branch office in St. Paul opened in late 1937 or early 1938, which was regarded as a part of the Minneapolis territory and was under the control and supervision of the Minneapolis manager. Under his employment agreement Henry Sand invested $700 and received 25 per cent of the net profits as compensation. In July of 1943 negotiations were commenced to form a partnership and pursuant thereto Articles of Partnership were signed by Henry Sand and plaintiffs dated as of July 1, 1943. Under the provisions of this agreement Henry Sand made an investment of $5000 in the business, was to

receive 30 per cent of the net profits, and he covenanted not to conduct any business in competition with the business of the partnership during the continuation of the partnership and likewise not to enter into any similar business in the territory in which the partnership was to operate for a period of five years after its termination, without the express consent of the plaintiffs herein. The Articles of Partnership named the operating territory as North Dakota, South Dakota, Minnesota and certain enumerated counties and places in Wisconsin. It was provided that the partnership could be terminated by any partner serving on the other partners a sixty day written notice of his intention to terminate it. After creation of the partnership Henry Sand actively ran the business with occasional written instructions by Koch and Heflebower, who also made infrequent trips to Minneapolis from Chicago for the express purpose of checking the business and making suggestions. The St. Paul office continued to be a part of the Minneapolis territory and was made a part of the partnership assets.

Around the 30th of June, 1945, Henry Sand called plaintiff Heflebower in Chicago informing him that he was terminating the partnership immediately and that a letter to that effect had been mailed the 29th of June. In pursuance of this intention Sand withdrew his $5000 capital investment in cash from the partnership bank funds and on or about July 1st removed certain beauty supply stock from the stockroom to premises known as 623–625 Marquette Avenue in Minneapolis. After making an accounting he deposited three of his personal checks to the credit of the partnership's bank account in the aggregate sum of $3,876.99, representing the excess in inventory value of the beauty stock withdrawn over and above the 30 per cent share of remaining assets, after dissolution of the partnership, to which he was entitled under the partnership agreement. Sometime in July of 1945 the defendant Cardinal Beauty Supply Company was incorporated with its office and stock room at 623–625 Marquette Avenue. The Articles of Incorporation are dated July 9, 1945, signed by defendants E. J. Sand

(wife of defendant Henry Sand), Gunderson, Feutz and Sweeney as incorporators and naming E. J. Sand, President; Gunderson, First Vice-President; Feutz, Second Vice-President; and Sweeney, Secretary and Treasurer. Henry Sand's wife, although not a paid employee of the partnership, had occasionally assisted her husband in his partnership duties. It is clear, however, that Henry Sand had a considerable capital investment in the Cardinal Company represented by cash and the merchandise removed from the partnership's stock room to the extent of about $13,000. At the first stockholders' meeting in January of 1946 Mrs. Sand resigned as President and Henry Sand was elected to succeed her. After June 30, 1945 and during the time the defendant corporation was being incorporated the individual defendants (with the exception of the Sands and Gunderson who had theretofore left) terminated their employment with the partnership and all later became employees of the defendant corporation in various capacities, continuing so to date.

Plaintiff Heflebower, pursuant to the telephone call from Henry Sand, came to Minneapolis the 3rd or 4th of July, 1945 and took over the remaining partnership assets, hired salesmen and installed a new manager who continued the business as it had been carried on previous to the partnership.

1. Plaintiffs contend and defendants recognize that Minnesota law should apply as to the validity and legal effect of the restrictive covenant in question contained in the Articles of Partnership (hereinafter referred to as the contract).

Did the contract in the instant case create an enforceable obligation upon defendant Sand not to engage in a similar business in competition with that of plaintiffs' during a certain period and within a prescribed territory after termination of the contract? In other words, have plaintiffs a substantive right under the contract which they may enforce? This must be determined by the law of the place where the contract was "made." 1 Dunnell, Minn.Dig., (2d Ed. & Supps.) Sec. 1532, and cases collected in note 35; Larx

Co., Inc., v. Nicol et al., Minn.; 28 N.W. 2d 705, citing Restatement, Conflict of Laws, Sec. 332. See also McCulloch v. Canadian Pacific Ry. Co., D.C.Minn., 53 F.Supp. 534; In re Wisconsin Central Railway Co., D.C.Minn., 63 F.Supp. 151; 30 Minn.L.Review 103. A contract is "made" in this sense where the final act to make it go into effect is done. 1 Dunnell, Minn.Dig. (2d Ed. & Supps.) Sec. 1532, and cases collected in note 36; Restatement, Conflict of Laws, Sec. 74. Here the "final act" necessary to effectuate a binding contract was the acceptance of the written offer of partnership contained in the Articles of Partnership mailed to defendant Sand from plaintiffs in Chicago, which he accomplished by placing his signature thereon and mailing back to plaintiffs. The contract was complete when the letter containing the signed contract was deposited in the post office in Minneapolis, 2 Dunnell, Minn.Dig. (2d Ed. & Supps.) Sec. 1748, 12 Am.Jur.Contracts, Secs. 46 and 57; 17 C.J.S., Contracts, § 52 (b); and that act having taken place in Minnesota its laws must apply as to the validity and legal effect of the contract.

2. Undoubtedly the leading case in Minnesota upon the subject of covenants negating competition is that of The Menter Co. v. Brock, 147 Minn. 407, 180 N. W. 553, 20 A.L.R. 857, wherein the court in denying relief set forth at great length the rule applicable in the granting or refusal of injunctive relief as applied to a negative covenant. The facts briefly are: Plaintiff, who operated a chain of clothing stores throughout the United States, hired defendant as manager of its Minneapolis store. The contract of employment at $35 a week provided that defendant for a period of four years after his term of employment ceased should not directly or indirectly enter into or engage in the same business as plaintiff in the City of Minneapolis. The rule is set forth as follows, 147 Minn. at page 409, 180 N.W. at page 554, 20 A.L.R. 857:

"Equity will not enjoin the breach of a negative covenant in a contract, unless *it is made to appear* that irreparable injury has resulted, or will in all probability re-

sult, to the complainant from such breach." (Emphasis supplied.)

See 16 Minn.L.R. 317 and cases collected therein. The court then applies this broad general rule to two specific instances:

(1) "In cases where an established business or trade and its good will has been sold, and, as part of the transaction, the seller has covenanted not to engage in the same business in the vicinity for a certain period, the mere breach strongly points to irreparable injury, in that the old business built up by him and his name will lose by having its customers drawn to a similar new enterprise when he enters it. By the purchase the buyer, upon a supposedly adequate consideration, secured a going business and its protection by the covenant from encroachment by the seller. Examples of such cases are furnished by Holliston v. Ernston, 124 Minn. 49, 144 N.W. 415; Andrews v. Kingsbury, 212 Ill. 97, 72 N.E. 11; Ropes v. Upton, 125 Mass. 258; Diamond Match Co. v. Roeber, 106 N.Y. 473, 13 N.E. 419, 60 Am. Rep. 464."

See also 17 Minn.L.R. 444; 9 A.L.R. 1457; 20 A.L.R. 863; 52 A.L.R. 1364; 67 A.L.R. 1003; 98 A.L.R. 965; National Benefit Co. v. Union Hospital Co., 45 Minn. 272, 47 N.W. 806, 11 L.R.A. 437; Southworth v. Davison, 106 Minn. 119, 118 N.W. 363; and Williams v. Thomson, 143 Minn. 454, 174 N.W. 307.

The second instance set forth in the Menter case is as follows:

"Where the services have been of such a character that the employee's name carries with it the good will of the employer's business, or where the employee has obtained knowledge of secrets in such business the disclosure of which would result in irreparable damage to the employer, it appearing that the subsequent employment was to obtain the benefit of the secrets or there was danger that such secrets would be disclosed in the subsequent employment, injunctive relief will be granted. See, also, Simms v. Burnette, 55 Fla. 702, 46 South. 90, 16 L.R.A.,N.S., 389, 127 Am.St. Rep. 201, 15 Ann.Cas. 690; Osius v. Hinch-

man, 150 Mich. 603, 114 N.W. 402, 16 L.R.A.,N.S., 393."

The court then makes a distinction of the facts in the Menter case in the following manner:

"Nor is this case like one where a person is hired to work up a route or territory and serve the customers obtained therein, as, for instance, a milk or laundry route, and the like. There the employee comes directly in contact with the customers. They may be attracted to him personally, and are likely to go with him should he enter the service of a competitor. Typical cases of this sort are found in Mutual Milk & Cream Co. v. Heldt, 120 App.Div. 795, 105 N.Y.S. 661; A.L. & J.J. Reynolds Co. v. Dreyer, 12 Misc.Rep. 368, 33 N.Y.S. 649; American Ice Co. v. Lynch, 74 N.J.Eq. 298, 70 A. 138; Eureka Laundry Co. v. Long, 146 Wis. 205, 131 N.W. 412, 35 L.R. A., N.S., 119. The right to injunction there is rested on the principle that the employer's business is wrongfully interfered with, and such interference readily appears when the former employee invades the route in behalf of a new employer."

And concludes by saying:

"Of course, cases relating to services of a unique kind, such as those of an opera singer, actor or person of special qualifications, are not in point here."

The Menter case is still in effect and has been cited, followed, or distinguished in a considerable number of subsequent decisions, as follows:

Granger v. Craven, 159 Minn. 296, 199 N.W. 10, 13, 52 A.L.R. 1356, where defendant, a physician, had entered into an employment contract with plaintiff, another physician, in which he covenanted not to compete with plaintiff in the City of Rochester, or within twenty miles thereof, for a period of three years after termination of the contract. The court, after thoroughly reviewing the Menter case, affirmed the granting of injunctive relief, saying:

"The needs and circumstances of the parties will be looked into in every case and each 'must be judged according to its own facts and circumstances.' National Benefit Co. v. Union Hospital Co., 45 Minn. 272, 47 N.W. 806, 11 L.R.A. 437. No contract should be enforced which seeks, not to protect the covenantee, but to repress the covenantor. If the covenantee has no legitimate interest to protect, or, having one, has sought to give it an unreasonable protection, one of a kind or degree not warranted by the circumstances, and particularly by the covenantor's power to do him harm, equity should not interfere. The Menter Co. v. Brock, supra, was such a case. But, given a legitimate interest protected to a reasonable degree, where damage beyond the power of law to prevent or make good is reasonably sure to follow a breach of the protecting covenant, its breach should be prevented by injunction. This is such a case."

See also Andrews v. Cosgriff, 175 Minn. 431, 221 N.W. 642; Shaleen v. Stratte, 188 Minn. 219, 246 N.W. 744; 9 A.L.R. 1472; 20 A.L.R. 866; 52 A.L.R. 1368; 67 A.L.R. 1008 and 98 A.L.R. 978.

People's Cleaning & Dyeing Co. v. Share, 168 Minn. 474, 477, 210 N.W. 397, 398, where defendant pursuant to a sale of his stock to plaintiff corporation, covenanted for a period of six years not to engage in the cleaning or dyeing business in Minneapolis individually or otherwise. Defendant, in addition to being a stockholder and director, had been employed by plaintiff and, as such employee, had a district in Minneapolis in which he solicited business and delivered goods. In upholding the granting of injunctive relief for defendant's violation of the covenant, the court held that just as a corporation might, on sale of its business, contract to refrain from competition, so officers or stockholders either on selling their stock, or on the corporation selling its business, might make effectively a reasonable restrictive agreement not to compete with the corporation or with a purchaser of its business, thereby making such a covenant analogous to one contained in the sale of an organized business and its good will as set forth in the Menter case. The court then continued as follows:

"In The Menter Co. v. Brock, * * *, the court referred with approval to cases holding that an employer may restrain a former employee, such as a driver of a milk wagon or laundry wagon, from soliciting the patronage of the employer's customers

on a route or in a district formerly covered by the employee. Drivers of vehicles sent out to pick up and deliver clothing to be cleaned are in the same class and should be subject to the same rule. Granger v. Craven, * * *, further defines the rule which we think applicable to the present case."

In Standard Oil Co. v. Bertelson, 186 Minn. 483, 243 N.W. 701, the court refused to enjoin the breach of a covenant contained in an employment contract whereby defendant was not to directly or indirectly sell or solicit orders for the sale of products furnished by others than plaintiff in the village of Buffalo Lake and surrounding territory for the period of one year from March 25, 1930; and, during said period and within said territory, not to directly or indirectly solicit, divert or take away any of plaintiff's customers. The court's refusal was based upon the grounds that the defendant employee did not come within any of the categories outlined in the Menter and Granger cases, supra, but was rather an ordinary workman whose place was readily filled by another employee, thereby negating irreparable damage to the covenantee.

The latest case citing the Menter case is that of Peterson v. Johnson Nut Co., 204 Minn. 300, 305, 283 N.W. 561, 565. The court there concludes that irreparable damages are presumed to follow from the mere breach of a negative restrictive covenant arising out of a sale of an organized business and its good will.

The Menter case has also been cited in Erikson v. Hawley, 56 App.D.C. 268, 12 F. 2d 491, 493; Super Maid Cook-Ware Corporation v. Hamil, 5 Cir., 50 F.2d 830, 831; McCluer v. Super Maid Cook-Ware Corporation, 10 Cir., 62 F.2d 426.

 Tested by the above rules this case falls. Here there is no sale of an organized business and its good will, nor any question of trade or business secrets. Neither is defendant Sand a professional man, nor did he acquire or occupy any confidential or close relations with the partnership's customers. Such being the facts, no presumption of irreparable injury arises in plaintiffs' favor from the mere breach of the restrictive covenant. It must be "made to appear" that such injury has resulted from said breach before this court will be required to issue an injunction enjoining further breach of the covenant. Has such a showing been made? Plaintiffs claim the receipts of the Minneapolis branch show a sharp decline after the partnership was terminated. The evidence as to what caused this loss is indefinite and unsatisfactory—perhaps necessarily so. There is no evidence of any direct diversion of business by defendant Sand other than the fact that business was generally solicited by the mailing of advertising cards of defendant corporation to members of the beauty trade within the partnership territory. It was adduced at the trial, however, that the mailing list used in the addressing of these cards was obtained from the State Hairdressers' Association and was not made up from any records of the partnership. Such practice amounted to nothing more than general competition and did not constitute unfair competition by reason of a violation of business secrets exclusively the property of the partnership or plaintiffs. It was also brought out at the trial that defendant corporation's salesmen made calls on some of the customers whom they had also solicited while in the employ of the partnership. It seems clear that this is a general practice universally indulged in by all salesmen and was a situation over which defendant Sand had no control. These salesmen brought many customers with them when they came to the partnership and took many with them when they left it to go to defendant corporation and to other employers in similar businesses. There is no showing of a specific amount of business, if any, diverted from plaintiffs by these activities, and it hardly can be assumed they caused substantial loss to plaintiffs. Conceding that plaintiffs' business decreased after July 1945 and in 1946, it may well be accounted for by the fact that competition was increasing. There is ample evidence that a number of new beauty supply companies have commenced business within, and old companies have extended their operations to, the territory embraced in the restrictive covenant in question since July of 1945. In addition, it was brought out that at least two of the large wholesale

jobbers of beauty products have refused to sell any of their products to the American Company because of the alleged anti-Semitic activities of plaintiffs, although they did sell to defendant Sand personally while he was with the partnership. It is wholly plausible that such activities are also responsible in whole or in part for the reduction of plaintiffs' business. Upon the termination of the partnership, plaintiff Heflebower came immediately to Minneapolis from Chicago and installed a new manager and augmented the sales force, with the result that the business was resumed in the same manner as it had been conducted previous to the partnership. There is no showing that any difficulty was encountered in securing a new, competent manager or salesmen or that the office remained closed for more than a few days. While it might be presumed that such substitution of a new manager, with the resultant temporary confusion, might have resulted in some loss of business to the plaintiffs, yet it failed to establish what is required in cases of this kind, namely, that the injury was irreparable. In fact, the evidence as a whole is not such as to justify this court in finding that defendants have caused irreparable injury to plaintiffs, or even any material or substantial loss.

It is true that plaintiffs in the good will of their business have a legitimate interest to protect. However, the protection they exact therefor fails to meet the test of reasonableness as set forth in the Granger case, in that it is clear that such interest needed no protection from the defendant Sand. He had not come into such close personal contact with the partnership customers that they would follow him to his new business. He came in personal contact with customers of the partnership only in rare instances when a customer dropped in at the Minneapolis office to make purchases and the regular clerk was not present to take care of them, or in a few instances when he personally went out to adjust complaints. Otherwise the business was all handled by employees under the firm name of American Beauty Products Company of Minnesota, which carries no association with defendant's name. In fact, it seems from the manner in which this business was conducted during the entire time in question here that a large proportion of the customers were not aware of Sand's change in status from an employee to that of a partner, or of the ultimate severance of his connection with the firm. Consequently when he left the partnership none of them would follow him with their business to his new firm thereby depriving plaintiffs of any "good will," as was the situation in Peoples Cleaning & Dyeing Co. v. Share, supra. If plaintiffs' primary purpose in exacting the restrictive covenant of defendant Sand was to protect a legitimate interest, namely the good will, why did they not exact similar restrictive covenants from the salesmen hired by the partnership? These were the employees who in the natural course of events came into close personal contact with the customers and whom the latter would be inclined to follow to a different place of business. It would seem that plaintiffs were seeking to suppress Sand's future activities in the beauty supply business rather than to protect the "good will" of their own business. If an injunction were to issue in this case it would only protect plaintiffs from general competition by defendant Sand through his corporation, which would constitute an unreasonable means of protecting the good will of the business and would result in repression of the covenantor rather than protection of the covenantee, which in the language of the Granger case precludes enforcement of the covenant.

3. Plaintiffs contend that a restrictive covenant contained in a partnership agreement or contract, as distinguished from an employment contract, requires a different treatment. They claim that any partner can make himself subject to a restrictive covenant which is reasonable, whereas only certain employees under certain circumstances can make themselves subject to restrictive covenants, which also must be reasonable. The alleged basis for this claim is that a partner by reason of that status alone is a proper subject of restraint. As authority for this contention plaintiffs place reliance upon Restatement of the Law, Contracts, Sec. 516 (d) and (f), wherein in clause (d) a restrictive covenant as to a partner is declared valid and

614

likewise in clause (f) as to an employee. Plaintiffs make much of the fact that in the comment on clause (d) no reference to or requirement of any duties, abilities or skill other than a mere status of a partner is required, while in the comment on clause (f) additional requirements are made either as to trade secrets or unique services or ability for an employee. These contentions can readily be answered by merely pointing out the purpose thereof as shown by the chapter and topic headings of which it is a part. Chapter 18 is entitled "Illegal Bargains" and topic 2 thereof of which Section 516 is a part is entitled "Bargains in Restraint of Trade." Section 513 of topic 2 defines bargains in restraint of trade and Section 514 provides that "a bargain in restraint of trade is illegal if the restraint is unreasonable." Section 516 then sets forth "instances of reasonable restraints." In other words, Section 516 merely decides that a bargain by a partner or by an employee which complies with the requirements therein set forth, is "not a bargain in restraint of trade" and is not therefore "illegal" and unenforceable. The mere fact that such a bargain is not illegal in its inception does not mean that it will be enforced as a matter of course by this court. Once having determined that it is not illegal, other requirements set forth by the Minnesota Court in the cases cited, supra, must first be satisfied before relief against the breach of a restrictive covenant will be granted.

Plaintiffs also rely on the case of Shaleen v. Stratte, 188 Minn. 219, 246 N.W. 744, as authority for their contention. That case involved a partnership between two physicians with a restrictive covenant contained in the Articles of Partnership and is authority for the proposition that such a restriction is a lawful one, and nothing more. There is no indication that a covenant not to compete incorporated in Articles of Partnership is to be treated in any different manner than a like covenant in an employment contract. In fact, the court indicates that the rule set forth in the Granger case is the correct one. The court in that case said:

"So far as possible invasions of a plaintiff's good will are concerned, there is no distinction between a contract such as we have here [employment] and a partnership. As a partner, Dr. Craven would have had no more opportunity for the acquisition of some of Dr. Granger's good will than he had as an assistant. * * *"

Thus, as the only "legitimate interest" plaintiffs here have to protect is the "good will" of their business, and as this court is concerned with possible invasions of that good will, the same test applied in the Granger case as to an employment contract must likewise be applied here to a partnership. The only distinction to be drawn from the facts in the Granger case and those in the instant case is that the customers of a physician on account of his close, personal relations with them are more apt to follow him to his new location than are the customers of a layman, and hence invasions of "good will" are regarded as more naturally following a breach of a restrictive covenant by a physician than by a layman.

4. Plaintiffs' claim for $50,000 damages in addition to injunctive relief may be disposed of briefly. It is well established in Minnesota that:

"To recover prospective profits as damages for a breach of contract, it must appear that the loss of profits was not a remote, but a direct, consequence of the breach; that the anticipated profits did not depend on contingencies, but were reasonably certain to accrue if the contract had not been breached; and that the amount of such profits was not conjectural or speculative, but was proved with reasonable, though not necessarily absolute, certainty. Loss of profits from the interruption of an established business may be recovered. The law does not refuse damages because of the difficulty of ascertaining their amount; but their amount must be fairly proved and not left to guess or conjecture." 2 Dunnell, Minn.Dig. (2d Ed. & Supps.) Sec. 2535, and cases collected in notes 4 and 5.

Plaintiffs have failed to show that loss of profits and good will, as well as depreciation in value of their property right in the business, were a direct consequence of the breach of the partnership agreement by defendant Sand. The elements of greatly increased competition and plaintiffs' alleged

anti-Semitic activities might just as easily have caused the claimed losses to plaintiffs as defendant Sand's breach of the agreement. At least they interject speculation and conjecture into the problem of determining the amount of loss, if any, caused to plaintiffs by defendant's breach. It must be held, therefore, that plaintiffs have failed to prove the amount of loss with reasonable certainty within the above rule. See also Hatch v. Kulick, 211 Minn. 309, 312, 1 N.W.2d 359, 361.

Findings of fact, conclusions of law and order for judgment will be filed in accordance with the foregoing views.