**H. B. FULLER COMPANY, Plaintiff,**

v.

**Howard D. HAGEN et al., Defendants.**

**Civ. No. 1973–117.**

United States District Court,
W. D. New York.

Aug. 8, 1973.

Raichle, Banning, Weiss & Halpern, Buffalo, N. Y. (Arnold Weiss & R. William Stephens, Buffalo, N. Y., of counsel), for plaintiff.

Henry G. Gossel, Buffalo, N. Y., for defendants.

CURTIN, District Judge.

This is an action for injunctive relief and damages. Before the court for decision at this time is plaintiff's application for a preliminary injunction.

The plaintiff, H. B. Fuller Company [Fuller], is a Minnesota corporation engaged nationwide in the manufacture, sale and distribution of adhesive products. The defendant, Howard D. Hagen, a Buffalo area resident, is a former employee of Fuller as Western New York sales representative. Mr. Hagen commenced his employment on March 1, 1966 and terminated it on November 30, 1972. At that time he became an employee of Knight Industrial Supplies, Inc. [Knight], the successor to Knight Industrial Supplies, a partnership. Knight Industrial Supplies as a partnership was formed in the fall of 1971 by Charlotte J. Degnan, wife of Earl J. Degnan, and Mary Ann Hagen, the wife of Howard D. Hagen. The corporation was formed on January 27, 1972.

Walter Beanblossom (not a defendant here) was an employee of Fuller as Western New York sales representative until December 31, 1971. On January 3, 1972, he became a consultant for Knight and, in March 1973, a full-time employee of Knight.

In this action, Fuller claims that Hagen was an unfaithful employee because he solicited orders for Knight while employed by Fuller, because he attempted to induce Fuller employees to accept Knight employment, and because he and the other defendants (Mary Ann Hagen, Charlotte J. and Earl J. Degnan) conspired to establish Knight as a Fuller competitor by the use of confidential information made available to him by Fuller. Fuller claims that after Hagen terminated his Fuller employment in November 1972, he violated the terms of his employment contract by making confidential information available to Knight, by soliciting orders in behalf of Knight in his former territory and from former customers, and by assisting Knight in the development of their adhesive products, which were in direct competition with Fuller. Fuller claims that the other defendants, with knowledge of Hagen's obligation to Fuller, willfully conspired with Hagen to sell adhesive products to Fuller customers formerly serviced by Hagen, using confidential information which Hagen obtained during the course of his Fuller employment.

During the hearing on the application for a preliminary injunction, it appeared that an order of consolidation should be entered pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure but, because of the vigorous objection of

defendants' attorney, the court did not issue an order of consolidation. The court has now reviewed the testimony at the hearing and the written briefs filed by the parties. The following constitutes the findings of fact and conclusions of law on plaintiff's application for a preliminary injunction.

Before 1966, Howard D. Hagen was employed as a salesman in the Buffalo area for a company selling package room supplies such as staplers, tapes and similar materials. Howard is married to defendant Mary Ann Hagen. The Hagens, who have eight children, were plagued in early 1972 by medical problems when their youngest child had orthopedic surgery and Mrs. Hagen was also hospitalized for a time.

In February 1966 when Robert Wischerath, District Manager for Fuller, interviewed Howard Hagen, he told Hagen that he would be required to sign an employment contract. On March 12, 1966, about a week and a half after Hagen began working for Fuller as sales representative covering the westerly counties in New York and Pennsylvania, he signed an employment contract.[1] Certain clauses in the contract are important for our decision. The contract provided that, for two years after termination of his Fuller employment, Hagen agreed not to sell a conflicting product in any territory in which he worked for Fuller, or to sell a conflicting product to any customer whose account he solicited in behalf of Fuller for two years immediately prior to termination. He agreed that for two years after termination he would not engage in the development of any conflicting products or service any company engaged in the development of a conflicting product, except after furnishing written assurance satisfactory to Fuller that his service for the new company did not relate to any conflicting product. If Fuller objected to Hagen's new employment because it violated the terms of the agreement, then Fuller agreed to pay Hagen for two years an amount which would at least bring his salary up to the level of his last Fuller base pay. Hagen agreed not to reveal confidential Fuller material to others and to return to Fuller all copies of any confidential material. His gross sales for Fuller amounted to $220,000 in 1966, $310,000 in 1967, about $387,000 in 1968, and averaged about $500,000 for the years 1969 to 1972. His compensation was $15,300 in 1967, $16,200 in 1968, rose to a high of $24,300 in 1969, and averaged about $16,500 in 1970 and 1971. From 1967 through 1971 Hagen took college courses in subjects related to his business, paid for by Fuller.

Before discharge in August 1971 because of an economic decline, Earl Degnan had worked for 26 years at Arcata Graphics Corp., a large color printing firm in the Buffalo area. For the last two years of his employment he was a pressman superintendent at a salary of $18,000. Earl is married to defendant Charlotte J. Degnan and they have two children in their late teens. Because of his duties at Arcata, Degnan was familiar to a degree with glue uses in the printing business, but was unacquainted with the adhesive business as a whole. Through his Arcata employment, he knew many individuals in the printing industry and related fields. After his layoff at Arcata, Degnan was not able to secure work in the printing business in the Buffalo area, but was reluctant to leave because of long-time family and neighborhood associations.

Howard Hagen and Earl Degnan had been neighbors and friends for many years and Degnan knew that Hagen was the area representative for Fuller. Because of his experience in the printing industry, Degnan felt that the large adhesive manufacturers were unable to service many small users of their product. He approached Hagen with the plan that he buy glue from Fuller, repackage and sell to the small business man. Hagen told his area manager, Robert Wischerath, that Earl Degnan

---

1. The contract is set forth as an Appendix to the opinion.

had formed a new company selling finishing room supplies, staples and tape. He related to him Degnan's plan to repackage Fuller's product for resale. Wischerath approved the sale to Degnan of five-gallon pails of glue at 55-gallon drum prices. This plan, which provided Degnan with a substantial discount and saved him the expense of repackaging, helped Degnan make a start. Eventually the parties contemplated that Degnan would buy in drum quantities and repackage on his own. Wischerath did not object to the repackaging plan for it is uneconomical for large companies like Fuller to deal with small users of glue.

On November 4, 1971, Charlotte Degnan and Mary Ann Hagen formed the partnership, Knight Industrial Supplies, with Earl Degnan as the sole employee. The company was financed by a $500 loan from Mary Ann Hagen drawn out of the Hagens' joint bank account. Mary Ann Hagen had some bookkeeping and secretarial duties, but Charlotte Degnan had no active role in the business. Wischerath was not informed of the Hagen-Degnan association. During November and December of 1971, Knight placed some small orders with Fuller but business was slow. In November when Wischerath learned that Hagen had made a small delivery for Knight, he told him that he could not make any calls or deliveries for the new firm. Hagen explained that he knew that rule, but the delivery was an emergency and would not be a regular occurrence.

On January 3, 1972, Degnan met with Walter Beanblossom, who had been a Fuller employee from 1954 until December 31, 1971. Although Degnan had met Beanblossom before the January 3 meeting, they were not well acquainted, while Hagen and Beanblossom had frequent occasion to meet because of their joint Fuller employment. Beanblossom also knew that Fuller had sold to Knight. For a number of years Beanblossom had been technical director of the Buffalo operation at $18,000 a year, responsible for pricing, formulation of various products and quality control. He made calls with salesmen to important customers when serious problems arose. At the hearing, Beanblossom explained that Fuller terminated him because of a personality clash between his supervisor and himself, because he had personal problems at the time, and because the elimination of his job meant a financial saving to Fuller. Fuller notified Beanblossom of his termination on about December 1, 1971. A few days later, however, when the Fuller supervision learned that Beanblossom was xeroxing Fuller formulas, he was directed not to report for work for the remainder of the month. His pay continued until December 31. Although Beanblossom vigorously denies the charge that he copied Fuller documents, the court credits the testimony to the contrary. Considering all of the circumstances, the court cannot accept the defendants' explanation that the meeting between Degnan and Beanblossom was a chance encounter.

During the January 3 meeting between Degnan and Beanblossom, Degnan hired Beanblossom as a consultant for Knight at $3,000 a year. Because Beanblossom had already obtained full-time employment with the Franklin Chemical Company at $20,000 a year, his activity for Knight was limited to weekend work and consultation by telephone. Franklin Chemical was not informed of Beanblossom's association with Knight. Following the meeting, they went directly to an equipment dealer to purchase a mixer and other supplies for the manufacture of glue. During 1972 Beanblossom instructed Degnan in the use of equipment, assisted him in the manufacture of the product and frequently discussed problems with him in person or by telephone. He has invested a sum or $4,000 in Knight—$1,000 on January 15, 1972, $2,000 on February 5, 1972, and $1,000 on March 20, 1972. On March 15, 1973, Beanblossom left Franklin Chemical to become a full-time Knight employee. Without informing Beanblossom, Degnan incorporated Knight Industrial Supplies, Inc. on January 20, 1972. A total of

$9,400 is invested in the corporation— $4,000 by Beanblossom, $3,500 by Mary Ann Hagen, and $1,900 by Degnan. On January 27, 1972, 50 shares of stock were issued to Earl Degnan and 50 shares to Mary Ann Hagen. On December 29, 1972, 50 shares were issued to Beanblossom. To date Knight has not paid Beanblossom his $3,000 consulting fee for 1972. The Hagen investment in Knight appears to be made up in the following way: On October 4, 1971 by a $200 check from Mary Ann Hagen; a short time thereafter by a $300 cash contribution, both from the joint account of the Hagens; on January 19, 1972 by a $2,000 check from the joint account of the Hagens and, in June 1972, by $1,000 in cash. In January 1972, the certificate of incorporation of Knight stated that its purpose was to "engage in manufacture, repackage and sell adhesives, purchase and resell shipping room supplies and other industrial items." Degnan had no experience in the sale of shipping room supplies, while this had been the business of Hagen for many years before his employment at Fuller.

Shortly after Beanblossom became active in Knight, it began the manufacture of glue early in February 1972. Although it continued to purchase small quantities from Fuller, for the most part Knight abandoned its efforts to repackage and sell to the small user. At the hearing, Degnan explained that he was able to obtain customers because he made many calls and had many contacts through his long association in the printing industry.

During 1972, Knight sales amounted to a gross of about $55,000 to $60,000. Of this amount, at least 85% was sold to Fuller customers called upon by Hagen. Knight records reveal that it has about 125 customers, but almost 85% of its business is with the 30 to 35 companies which were Fuller accounts.

Because the adhesives products manufactured by all the major companies are

virtually identical, it is a highly competitive business. Price and service are most important considerations and sales to large volume users are the most desired in the business. Therefore, it is important for a salesman in the glue industry to have as much information as possible about the price offered by his competitors and the problems of his potential customers. It is important that he be well acquainted with customers' plant conditions relating to temperature, use of machines, vibration, humidity and bonding problems. Some businesses pose special problems which only an experienced adhesive salesman would be familiar with. At Rich Products there is an extensive freezer operation where the problems of application and bonding would be much different from an industry where the adhesive material is applied under extreme conditions of heat or moisture.

Because of his employment for Fuller, Hagen was well informed as to all these particulars for the glue users in the Western New York area, while Degnan had no information except the limited degree in the printing business. In addition, during his employment with Fuller, Hagen received a monthly IBM print-out which set forth all the active Fuller accounts in his territory during the last few years, the sales to each customer for the current month, a comparison of monthly sales with the sales for the prior year, and the total sales for the year to each customer. Hagen's contract required that he return these sheets to his employer but he failed to do this when he left, explaining that the sheets had been destroyed. Hagen admits that the information contained on the IBM sheets would be most helpful to any competitor, but he and Degnan deny using the sheets or any of the information garnered from them during his subsequent employment for Knight. Although there is no evidence that Hagen used the print-outs directly with Degnan to further Knight's interests, full credit cannot be given to their denial because

of the circumstance that almost all of Knight's customers were customers of Fuller and because, in some instances, Knight obtained or sought Fuller business by slightly underbidding the Fuller price.

Degnan claims that Knight sales in 1972 have not damaged Fuller. In some instances he asserts that the Knight sales to a Fuller customer did not replace a Fuller product, but that of another company. In this category he places sales to Colad of about $1,000, to Fisher-Price Co. of about $3,400 and to Mod-Pac in the amount of about $1,200. In connection with the largest sales to any one customer, a total of $21,500 to the Lawless Container Corp., he claims that Lawless installed a new laminating machine, that he did not know anyone at the Lawless plant and obtained the order after his product was submitted to a series of tests. He admits that $14,000 in sales were made to former customers of Fuller, namely, sales to Continental Can of about $4,400 and sales to Rich Products of about $5,100. From these facts, it is fair to conclude that for the most part Knight quickly abandoned its scheme to service many small customers and concentrated its sales efforts upon fairly large users of glue. Since February 1972, it has attempted to sell glue in large quantities, for the bulk of its business is with seven or eight companies all customers or former customers of Fuller.

Furthermore, assuming Degnan worked diligently to acquire the accounts for Knight, Hagen did little to prevent the loss of some old accounts of Fuller to Knight and did little to obtain new business which went to Knight.

The most flagrant example of the loss of old business is the replacement of Fuller by Knight at Rich Products Co. Degnan denies knowing any salespeople there before his call, or that he was assisted by Hagen. Nevertheless, Knight's bid was two-and-a-half cents lower per pound than Fuller. Rich purchased $45,000 from Fuller in 1970, about $43,000 in 1971, but only $18,000 in 1972 and nothing at all to date in 1973. Knight's sales to Rich began in early 1972 and, after August 1972, Fuller was cut out entirely. When Hagen's supervisor questioned him about this loss of business, Hagen said that Rich had switched to "hot melt," that he had tried to get this business but was not able to. That explanation proved to be without foundation, for Knight sells to Rich a glue similar to the one which Fuller sold before. At the hearing, Hagen was unable to explain why he lost the account to Fuller or what steps he took to regain it. There was no evidence offered at the hearing to show that he made any calls upon Lawless at a time when Knight was securing $21,000 in new business during 1972.

On November 1, 1972, there was a reorganization in the Fuller Co. Mr. Wischerath was placed in charge of a division known as Assembly Products and his replacement in the Buffalo district was Richard Coleman. On November 6, 1972, Hagen submitted a letter of resignation to Coleman, stating that he thought he had been passed over and explaining that he planned to go into business with his uncle in rebuilding cars or to become associated as a partner in a business in Rochester. In connection with the reorganization, Hagen would have lost some business to the new Assembly Products Division headed by Wischerath, but he would take on sales duties in about four additional counties. According to Wischerath, the average additional gross sales to come to Hagen's territory was about $75,000 after the reorganization. This new assignment of territory was due to go into effect on December 1, 1972. These counties are mainly south of Rochester where Hagen claims he now is salesman for Knight. Instead of embarking on either of the business ventures described to Mr. Coleman, upon termination Hag-

en immediately went on the payroll of Knight in December 1972. He claims that his sales activities for Knight are exclusively in the Rochester area, not within the territory which he formerly covered for Fuller.

By affidavit and testimony, Hagen asserts that he was a loyal employee for Fuller and denies ever making any calls with Degnan in behalf of Knight. If this were in fact the case, perhaps Hagen's position would appear in a better light. However, not only his loyalty to Fuller but his credibility was seriously undermined when the evidence disclosed that these assertions were not true. On cross-examination, Hagen admitted that in January 1972, ten months before he left Fuller's employ, he called on Noury Chemical Co., accompanied by Degnan, and told the Noury representative to purchase adhesives from Knight rather than from Fuller. Representatives of three other firms in his former territory for Fuller testified that in December 1972 and January 1973 he called upon them, accompanied by Degnan, in an effort to persuade them to purchase adhesives from Knight. In March 1973, when Hagen and Degnan called upon the Inland Container Co. in Erie, Pennsylvania, they quoted a price of ten cents a pound less than that given by Fuller to Inland. During the late summer and early fall of 1972, Hagen attempted to persuade three Fuller employees, two salesmen and a secretary, to leave Fuller to come to work for his new company. In the summer of 1972, he told one of them that Walter Beanblossom would be in the business. Although Knight claims that Hagen's duties are confined to the Rochester area at the present time, his sales calls with Degnan tend to show otherwise. Furthermore, Knight records indicate that the Rochester area is a very small part of the Knight business. Although Hagen does not have any regular duties in the manufacture of the Knight product, he has assisted Beanblossom and Degnan in the manufacturing operation and makes up his own samples to take to the Rochester area. The evidence disclosed that in November 1972 Degnan and Hagen met with an attorney and discussed Hagen's contract with Fuller. Among other things, the attorney advised them that Hagen not work in his old Fuller territory for two years after his termination. In spite of that advice, Hagen made calls with Degnan upon former customers.

Although Hagen claims that he did not decide to go into business with Degnan until November 1972 when the new area manager was appointed, the facts point to the conclusion that, from the inception of the business, it was the intention of Degnan and Hagen that Hagen participate in some manner in the Knight enterprise.

The first question to determine is whether Minnesota or New York law applies. Considering all of the contacts, the court concludes that the law of New York is controlling. Defendant Hagen was hired in Buffalo, signed his contract there and called upon customers in the Western New York area, except for a few in western Pennsylvania. His supervision came from the Buffalo office and he had no contact with Minnesota except that the Fuller headquarters was located there. Minnesota contacts are limited to the fact that it was there that management signed the contract with Hagen, and the contract provided that it be construed by Minnesota law.

The evidence previously recited makes clear that the defendant Hagen did not fulfill his common-law obligation of loyalty to his employer during the term of his employment. Duane Jones Co., Inc. v. Burke, 306 N.Y. 172, 117 N. E.2d 237 (1954); Universal Electric Corp. v. Golden Shield Corp., 316 F.2d 568 (1st Cir. 1963).

Whether Minnesota or New York law controls, the principles of law in each state in regard to employment contracts

are similar. Minnesota law is set forth in Hedberg v. State Farm Mutual Automobile Insurance Co., 350 F.2d 924, 931 (8th Cir. 1965):

> . . . Minnesota cases hold that the test of the validity of an agreement not to compete, contained in an employment contract, is one of reasonableness and that this is to be tested by the facts of the particular case, . . . that these agreements are to be strictly construed and the restraint imposed no further than the language of the contract absolutely requires, . . . that an injunction is not usually indicated unless irreparable injury to the plaintiff probably will result; and that the presence or absence of personal contacts by the employee with customers, needless deprival of livelihood, fairness, and the existence in the plaintiff of a legitimate interest which deserves protection, are relevant factors, . . . ..

In the *Hedberg* case, the preliminary injunction issued by the district court was affirmed upon appeal. *See also* Menter Co. v. Brock, 147 Minn. 407, 180 N.M. 553 (1920), and Heflebower v. Sand, 71 F.Supp. 607 (D.Minn.1947).

The New York law was recently summarized by Judge Fuld in Purchasing Associates, Inc. v. Weitz, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 248 (1963):

> Thus, a covenant by which an employee simply agrees, as a condition of his employment, not to compete with his employer after they have severed relations is not only subject to the overriding limitation of "reasonableness" but is enforced only to the extent necessary to prevent the employee's use or disclosure of his former employer's trade secrets, processes or formulae . . . or his solicitation of, or disclosure of any information concerning, the other's customers. . . . If, however, the employee's services are deemed "special, unique or extraordinary", then, the covenant

may be enforced by injunctive relief, if "reasonable," even though the employment did not involve the possession of trade secrets or confidential customer lists.

The case most frequently cited as setting forth New York law is Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 320, 321, 140 N.E. 708, 711, 712 (1923). In that case the general principle in New York law was stated in the following way:

> An express negative covenant not to work for another will not, as a rule, be granted save in those exceptional cases where, by reason of the peculiar or extraordinary character of the services, a violation of an agreement will cause injury to the employer for which an action at law will afford no adequate remedy. An injunction may always issue to enforce such a covenant where the employee has become the possessor of valuable trade secrets concerning his employer's business.
>
> \*  \*  \*  \*  \*  \*
>
> In the cases where a court has enforced a negative covenant by an employee not to work for another for a long period of time and about the nature of whose work there is nothing special or peculiarly valuable, the element of trade secrets or unfair dealing has been controlling and important. . . . Each case must depend upon its own facts and circumstances. Any unfair competition or practice may move equity to enforce a negative covenant.

The contract must be limited as to duration and territorial scope. Purchasing Associates v. Weitz, *supra.* The employment contract between Hagen and Fuller meets the test of New York law. The court rejects the argument of defendant Hagen that it was executed under coercive circumstances. The contract is reasonable and should be enforced. From the evidence, the court is satisfied that after Hagen terminated his employment with Fuller he violated

the terms of the contract in several respects. An injunction should issue against defendant Hagen. Mixing Equipment Co. v. Philadelphia Gear, Inc., 436 F.2d 1308 (3d Cir. 1971); Award Incentives v. Van Rooyen, 263 F.2d 173 (3d Cir. 1959); Elbe File & Binder Co. v. Fine, 137 Misc. 255, 242 N.Y.S. 632 (Sup.Ct.1930); Universal Electric Corp. v. Golden Shield Corp., *supra.*

■ The theory of plaintiff's action against the other defendants is that they tortiously interfered with Hagen's obligation to his employer both during and after his employment with Fuller. In Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956), the Court of Appeals summarized New York law:

> For [the plaintiff] to succeed on his second cause of action [for inducing breach of contract] he would have to prove: (1) the existence of a valid contract between [the other "contracting party"] and himself; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach of that contract by [the other party], and (4) damages.

The New York theory earlier had been explained:

> The gist of the action is not the intent to injure, but to interfere without justification with plaintiff's contractual rights with knowledge thereof. Lamb v. S. Cheney & Son, 227 N.Y. 418, 422, 125 N.E. 817, 818 (1919).

There is sufficient evidence to find that Degnan knowingly interfered with Hagen's obligation to his employer from early 1972 until the time the action was filed in this case. However, there is no evidence to link either Mary Ann Hagen or Charlotte J. Degnan to the manufacturing or sales efforts of Knight and, therefore, no purpose would be served by issuing an injunction against them.

In order to avoid irreparable injury to plaintiff, a limited preliminary injunction should issue, pursuant to Rule 65 of the Federal Rules of Civil Procedure, against defendants Howard D. Hagen, Earl J. Degnan and Knight Industrial Supplies, Inc. Mixing Equipment Co. v. Philadelphia Gear, Inc., *supra*; Frederick Chusid & Co. v. Marshall Leeman & Co., 279 F.Supp. 913 (S.D.N.Y.1968).

Defendants argue that the injunction should not issue because the amount of business taken by Knight from Fuller is small when compared to the total Fuller business, and because an injunction would impose a severe hardship upon both Hagen and Degnan and their families. After carefully considering these arguments, the court has nevertheless, under all of the circumstances, concluded that the injunction should issue. The injunction for all defendants shall be for a period of two years from the date of Hagen's termination by Fuller. Howard D. Hagen is restrained from violating the terms of his employment contract. Defendants Earl J. Degnan and Knight Industrial Supplies, Inc. are restrained from using any confidential information relating to Fuller's business or customers, or selling or offering to sell conflicting products to customers listed on plaintiff's Exhibits 3B and 3C. This order for a preliminary injunction shall become effective on August 22, 1973. This court shall not consider an application for a further stay.

So ordered.

See Appendix on next page.

APPENDIX

The employment contract reads as follows:

## H. B. FULLER COMPANY
## EMPLOYMENT AGREEMENT

Fuller and Employee, recognizing that the Employee's position with Fuller is one in which he will receive or contribute Confidential Information, agree as follows:

A. DEFINITIONS

In this agreement the following definitions shall apply:

1. "FULLER" means H. B. Fuller Company and any of its subsidiaries and affiliates on behalf of whom this agreement is executed.

2. "EMPLOYEE" means the individual who signs this agreement as an Employee.

3. "CONFIDENTIAL INFORMATION" means Fuller's formulas, processes, customer lists and requirements, and information, not generally known, relating to research, development, manufacture and sale of Fuller products.

4. "CONFLICTING PRODUCT" means any product or process of any person, firm or corporation (other than Fuller) in existence or under development, which resembles or competes with a product or process upon which the Employee may have worked or which he may have sold during his employment by Fuller, or concerning which he has acquired Confidential Information through his work with Fuller.

B. FULLER'S OBLIGATIONS TO THE EMPLOYEE

Fuller agrees:

1. To employ or continue to employ Employee at the rate or rates of compensation from time to time prevailing for the Employee's classification, or at such rate as is mutually agreed upon;

2. To terminate Employee's service only after thirty (30) days advance notice, except for cause;

3. To furnish Employee with all information in respect to its formulas, processes, customer data and other Confidential Information necessary for his work; and

4. In the event of termination of Employee's service prior to normal retirement, to make the following payments to the Employee:

(a) If Employee is unable to take or retain a position of employment solely because of objections by Fuller that the position violates the terms of this agreement, and if (b) Employee is thereby unable to earn compensation at least equal to his base pay at the date of termination of his employment with Fuller, during any part of the two (2) year period during which he has in Paragraph 4 of Section C hereof agreed not to be involved in the sale, development or production of Conflicting Products, Fuller will pay him monthly an amount equal to the difference between such base pay (exclusive of all extra

or contingent compensation bonuses and employee benefits) and the amount he actually earns for each month during the two (2) year period for which he first furnishes Fuller a signed statement setting forth his actual earnings, and the manner in which the terms of the agreement have prevented him from earning an amount equal at least to such monthly base pay. Fuller may at any time during such two (2) year period relieve itself of further monthly payments by furnishing the Employee a written release of his obligations under Paragraph 4 of Section C of this agreement. In no event will Fuller ever pay or be liable for any amount greater than the equivalent of 24 monthly payments.

## C. EMPLOYEE'S OBLIGATION TO FULLER
Employee agrees:

1. (a) All formulas, processes and inventions which Employee may learn or have access to, or which Employee may have a part in developing (i) during employment with Fuller or (ii) within one (1) year of termination of employment with Fuller based on Confidential Information, are and shall remain the sole property of Fuller; and (b) all formulas, processes, information, rights, patent applications, patents, and written data in respect to the same shall be promptly turned over to and assigned to Fuller without charge to Fuller.

2. No Confidential Information shall ever be disclosed to others, either during or after employment by Fuller, except as required by the Employee's duties to Fuller.

3. Upon termination of employment with Fuller, all data and records of Confidential Information, including all copies, excerpts and summaries in the Employee's possession or control (whether prepared by Fuller, by the Employee or by others), shall be left with Fuller.

4. For two (2) years after termination of employment with Fuller (for any reason or by either party) Employee will not, directly or indirectly, either as a proprietor, partner, employee, or agent:

(a) Sell or promote the sale of, Conflicting Products in any territory in which the Employee was working for Fuller within the two year period immediately preceding termination of his employment with Fuller;

(b) Sell, or solicit orders for, any Conflicting Products to or from any customer whom he solicited, or whose account he serviced for Fuller, at any time within the two year period immediately preceding termination of his employment with Fuller;

(c) Engage in or be employed in the development or production of Conflicting Products;

(d) Serve any organization engaged in development or production of Conflicting Products except after furnishing Fuller written assurances, both from him and from his new employer, in form and substance satisfactory to Fuller, stating that the Employee will not, for such two (2) year period, render services which will directly or indirectly relate to any Conflicting Products.

## D. OTHER PROVISIONS

1. This agreement shall be binding upon and enure to the benefit of Fuller's successors and assigns, and the provisions of Paragraphs 1, 2 and 3 of Section C of this employment agreement shall be binding on the Employee's heirs, executors, administrators and assigns.

2. This agreement shall be governed by Minnesota law, regardless of where it is entered into or performed.

3. The parties agree that the provisions of this agreement are reasonable and necessary for the protection of Fuller in its employment of the Employee and its furnishing to the Employee of Confidential Information and that they are also reasonable and necessary for the protection of the interests of all Fuller's employees.

4. The parties agree that if any provision, sentence, clause, or part of this agreement is void or unenforceable for any reason whatsoever, the remaining portions shall remain in full force and effect.

5. This agreement shall supercede and replace any prior employment agreement between the parties relating generally to the same subject matter.

IN WITNESS WHEREOF, the parties have duly executed this Employment Agreement.

EMPLOYEE:

Signature:(s) Howard D. Hagen

Date: March 12, 1966

Name: (typed) Howard D. Hagen

Home Address: 90 Morris Circle

Depew, New York 14043

H. B. FULLER COMPANY
St. Paul, Minnesota

(or _____)
(a subsidiary of H. B. Fuller Company)

By:(s) D. G. Croonquist

Title: Sec.–Treas.

Date: 3/28/66